# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1407

_____

Janice L. White,                          *
                                          *
          Plaintiff-Appellant,            *  Appeal from the United States
                                          *  District Court for the District
     v.                                   *  of
                                          *  Minnesota.
Honeywell, Inc.,                          *
                                          *
          Defendant-Appellee.             *
                                          *

_____

Submitted: October 24, 1997
          Filed: April 20, 1998

_____

Before RICHARD S. ARNOLD, Chief Judge, LOKEN and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Janice L. White brought this racial harassment and constructive discharge suit against her employer, Honeywell, Inc. Following trial, a jury rendered its verdict in favor of Honeywell on each claim. White appeals various evidentiary rulings made by the district court during the course of trial and challenges the jury instruction on constructive discharge. We reverse and remand for a new trial.

I.

Janice White filed this lawsuit on November 30, 1993, alleging that Honeywell violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (1994), and 42 U.S.C. § 1981 (1994), as amended by the Civil Rights Act of 1991. Specifically, White alleged that Honeywell subjected her to a racially hostile work environment from March 1984 through her alleged constructive discharge on June 24, 1992, when she left work on a medical leave of absence due to a mental breakdown.[1] At trial, the district court limited the scope of White's Title VII claim to acts occurring after September 13, 1990. That was the date White filed her first administrative charge with the Minneapolis Department of Civil Rights and the Equal Employment Opportunity Commission (the EEOC), alleging racial harassment, reprisal, and unfair job assignments. She failed, however, to timely file suit after receiving a no probable cause finding and a right to sue letter. Her present lawsuit is based on two subsequent administrative charges alleging a racially hostile work environment, constructive discharge, and retaliation. The agencies found no probable cause on either charge and again issued right to sue letters. The district court determined that although White had alleged a continuing violation since 1984, her failure to timely file suit on the first administrative charge required it to limit the scope of her Title VII claim to acts occurring after September 13, 1990. The district court also limited White's § 1981 claim of racial discrimination to acts occurring after November 21, 1991, the effective date of the Civil Rights Act of 1991.

---

[1]White's complaint also included a claim of retaliation, but the district court granted Honeywell's motion for summary judgment on that claim, and it is not at issue in this appeal.

The evidence presented at trial included the following.[2]  Janice White, an African-American woman, began working in Honeywell's assembly department in 1978.  In 1984, she transferred to a position as one of two factory clerks in the Minneapolis general offices, where she reported directly to Dave Easthagen, who reported directly to Bill Megarry, who was under Caren Olsen.  White worked closely with a co-clerk, Mildred Benson, who is a Caucasian woman.  From 1984 through 1992, Benson and White worked side by side in a large office area where White was the only African-American worker.

White attempted to show she suffered racial harassment from Benson, her co-worker.  White alleged that she suffered a pattern of daily verbal abuse by Benson, who referred to White as a "colored girl," "jackass," "asshole," and "little black bitch," among other derogatory names.  (Appellant's App. at 210.)  White said Benson would throw work at her desk rather than hand it to her and that Benson always spoke to her in very harsh terms, criticized her work, and accused her of being lazy and stupid.  White testified that when she asked Benson why Benson treated her so poorly, Benson "would just tell me I could leave if I didn't like what she was doing."  (Id. at 221.)  White kept a journal in which she recorded the alleged abuse she said she endured.  White believed that Benson's attitude and behavior were motivated by prejudice on the basis of White's race.

---

[2]We note that we are not reviewing the evidence on a claim of insufficient evidence to support the verdict, a standard under which we review the facts in the light most favorable to the verdict.  See Ryther v. Kare 11, 108 F.3d 832, 836 (8th Cir.) (en banc), cert. denied, 117 S. Ct. 2510 (1997).  Instead, we are reviewing the evidence with claims of evidentiary and instructional error in mind.  For this reason, while we respect and give great deference to a jury's fact-finding role, our concern in this case is to recite the evidence presented by both parties in order to review the district court's discretionary evidentiary and instructional decisions.

White said that she often complained of this alleged racial harassment to Easthagen, her immediate supervisor, and to his immediate supervisor, Megarry. She complains that instead of investigating her allegations, they made excuses for Benson—and gave Benson more favorable treatment. White said she also discussed her complaints with Caren Olsen, who at first was Megarry's supervisor and after a company reorganization became Easthagen's direct supervisor. Thus, according to White, Honeywell management knew of her complaints of racial harassment yet did nothing to change her racially hostile working environment. White testified that she became increasingly emotionally upset over how she was being treated and because Honeywell was doing nothing to improve the situation despite her repeated complaints and suggestions.

White presented the testimony of other workers who had heard Benson raise her voice to White (Appellant's App. at 133) and who had also heard Benson call White names such as "asshole" and "black bitch" (id. at 829). Fred Ewing, a Honeywell manager, testified that Benson's abusive behavior was common knowledge among the managers, including Easthagen, Megarry, and Olsen. Ewing had heard them informally wondering how White could take the abuse. He said that management generally accepted Benson's behavior, stating, "We knew how Millie was." (Id. at 134.)

White testified that after September 13, 1990 (the date of her first EEOC charge), the verbal abuse by Benson intensified. White began to lose hope that she would ever see improvement in the situation, and she said she sought counseling in 1991 when her depression over the situation caused her to become suicidal. White also asserted that in June 1992, Benson once again had called her a "little black bitch," and she was certain that on this occasion, Easthagen had overheard the comment. (Id. at 293-94.) Easthagen denied overhearing any such remark when White complained to him, and Benson denied making the remark when Easthagen confronted her. White reported the incident to labor relations, but again nothing came of her complaint. Additionally, close in time to this incident, a custodian told White he would give her

-4-

a quarter if she would bend over.  When she complained of the custodian's behavior to his supervisor, the supervisor told her it was a form of a compliment.  However, the custodian was ultimately reprimanded for his conduct.

On June 24, 1992, White was found in Honeywell's conference center crying hysterically.  An employee assistance program counselor, Susan Searle, decided White should be taken to a hospital emergency room.  White told Searle, "I just don't want to be harassed when I come to work."  (Id. at 699.)  Searle said that White specifically referenced Benson's remarks and the custodian's comment.  White never returned to work.  She presented evidence that she was treated for an acute episode of depression and anxiety with uncontrollable weeping secondary to work-related stress.  She was eventually awarded full disability benefits for major depression and was still on an unpaid medical leave of absence from Honeywell at the time of trial.  White presented the testimony of Dr. Carol Novak, who diagnosed White as having major depressive disorder, severe, with psychotic features. Dr. Novak testified that White's troubles at Honeywell had contributed significantly to this diagnosis.

Honeywell's evidence contradicted White's testimony.  Benson denied calling White derogatory names or directing profanity at her and denied feeling irritated or annoyed by White.  Benson said she had very little to do with White.

Honeywell presented the testimony of managers and other employees as well.  Easthagen denied any knowledge that race was at issue in the dispute between White and Benson until after White filed her first EEOC charge. He testified that he understood White's complaints as amounting to nothing more than a personality conflict between the two women.  He therefore did not investigate whether Benson's actions were racially motivated. Easthagen testified that no practical alternative existed to the two of them working in close proximity given their job assignments.  Olsen also denied knowledge that the problems between White and Benson involved any racial animus.  Honeywell presented evidence that White was free to transfer to several other available

positions at the same rate of pay, yet she chose to keep working with Benson.  Honeywell presented the testimony of several co-workers who said they never heard Benson use inappropriate language when speaking to White. Honeywell also presented evidence that White never filed a union grievance concerning the situation.

Honeywell presented evidence to show that White's experience at Honeywell was not the cause of her mental health problems.  Honeywell demonstrated that White had a long history of depression and personal problems, suffering several bouts of depression throughout the late 1970s and 1980s.  In 1977, White's twin brother shot White and her three-year-old son, killing both her son and the fetus she was carrying.  She also has been a victim of domestic abuse at the hands of her husband.  Additionally, Honeywell presented evidence that White's treating physicians provided Honeywell with several dates when White could be expected to return to work, but White never returned.  She remained on medical leave through the time of trial.

The jury was asked to respond to three special verdicts: (1) whether White was subject to a racially hostile work environment between November 21, 1991, and June 24, 1992; (2) whether White was subject to a racially hostile work environment between September 30, 1990, and June 24, 1992; and (3) whether White was constructively discharged on the basis of her race. After hearing all the evidence, the jury found for Honeywell on all three claims.  White appeals, contending that the district court committed reversible error by excluding her evidence of a racially derogatory statement by Megarry (a now deceased former supervisor), by admitting into evidence the EEOC no probable cause findings, and by erroneously instructing the jury on the requirements for a constructive discharge.

II.

A.  Discriminatory Statement of Supervisor

White challenges the verdicts on her hostile environment claim, contending first that the district court abused its discretion by excluding from evidence a discriminatory statement allegedly made in 1988 by Bill Megarry, when he was Easthagen's direct supervisor.  The statement excluded from evidence would have shown that when confronted with White's complaints through a union representative in 1988, Megarry responded, "If the dumb nigger doesn't like it she can sign out."  (Appellant's App. at 59.)  The district court concluded that the prejudicial effect of this evidence outweighed its probative value under Federal Rule of Evidence 403.  We give substantial deference to the trial court's exclusion of evidence under Rule 403, but the trial court's exercise of discretion in excluding evidence "must not unfairly prevent a party from proving his [or her] case." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1102-03 (8th Cir. 1988). Additionally, Rule 103 "preclude[s] a finding of reversible error unless the trial court's evidentiary rulings have affected [a party's] substantial rights."  Id. at 1105.

Title VII provides, in part, that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a).  Consistent with this language, courts have held that Title VII protects a worker from discriminatory conduct that is so severe and pervasive as "to create an objectively hostile or abusive work environment." Harris v. Forklift Sys., Inc. 510 U.S. 17, 21 (1993).  This occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Id. (internal quotations and citations omitted).  Whether a hostile environment existed can be determined only by looking at all the circumstances, which "include the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. Thus, "[e]vidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment." Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 355 (8th Cir. 1997) (internal quotations and alteration omitted).

At the time Megarry allegedly made the statement, he was a supervisor in White's chain of command and was responsible for labor relations, but he was no longer a direct supervisor of White during the actionable period for this suit. The district court addressed the admissibility of Megarry's statement at three separate times during the trial. The first time was when the court considered Honeywell's motion in limine to exclude the statement. Assuming the statement was admissible under Rule 801(d)(2)(D) as nonhearsay, the court expressed the view that the statement was "so prejudicial and so inflammatory" that it had to be excluded, even though the court also found that it was of "heavy" relevance. (Appellant's Adden. at 18.) The court also stated that its Rule 403 balancing was influenced by the fact that "you have so much other evidence -- if this was the only statement or the only comment being made or if this [was] where the real onus of your case laid -- with Mr. Megarry's statement -- I would go the other way." (Id.) It is clear the court understood the purpose for which the statement was being offered, i.e., "that Honeywell had either a bad attitude about blacks or was willing to put up with harassment of blacks; and, to me, the relevance of that [statement] then diminishes a bit." (Id.) The court also was greatly concerned that because Mr. Megarry was deceased, Honeywell could not put him on the stand to deny or explain the alleged statement. It also noted that the statement was not made directly to White and was not made during the actionable period of time. The court ended its balancing remarks by saying: "[I]t would be unfair to let anybody testify to what Mister Megarry said, because of the very inflammatory words. For that very reason I am going to not allow it to come in." (Id. at 20.) When White's counsel protested the

ruling, the court returned to Megarry's unavailability saying, "If Megarry was here, it would come in."  (Id. at 22.)

After Honeywell's counsel had told the jury in his opening statement about Honeywell's favorable treatment of different races and Honeywell's attitude toward black people in general, White's counsel asked the court to revisit its decision excluding Megarry's comment.  The court again indicated that use of the comment would be unfair because Megarry could not defend himself and that the plaintiff had "lots of other evidence . . . to show that attitude."  (Id. at 25.)

Later, during trial, the issue was addressed for the final time. After hearing both counsels' renewed arguments, the court reaffirmed its initial Rule 403 ruling while recognizing the very importance of the statement to the plaintiff ("[B]ecause, you know, it is what is normally called a 'smoking gun' kind of statement") (id. at 33).  Concluding that the comment was a "very, very exacerbating kind of evidence," and that it was "very prejudicial," and that the ruling was "close," the court ruled that basic fairness required that the comment not come in even though it was relevant and might be admissible under Rule 801.  We agree that this statement was not hearsay and was admissible as a statement by a party's agent made during the existence of the relationship and concerning a matter within the scope of the employment.  See Fed. R. Evid. 801(d)(2)(D). Additionally, the district court correctly recognized that such evidence remains subject to Rule 403's balancing of the danger of unfair prejudicial effect and the probative value of the statement.  See Mahlandt v. Wild Canid Survival & Research Ctr., 588 F.2d 626, 631 (8th Cir. 1978).  We also agree with the district court that Megarry's statement is not itself actionable conduct because it falls outside the time limitations imposed on the actionable conduct for this suit.  Nevertheless, considering the totality of the circumstances, we respectfully disagree with the court's ultimate conclusion, find that a mistake has been made, and determine that the court abused its discretion in excluding the proffered statement.  The statement is relevant and highly probative background material which, in our view, should have been

admitted, because its probative value was not substantially outweighed by any danger of unfair prejudice.

This background evidence, if believed by the jury, would have helped White to demonstrate knowledge and an ongoing pattern of racial harassment and discriminatory animus directly linked to the management-level at Honeywell. We have long held that "[e]vidence of prior acts of discrimination is relevant to an employer's motive . . . , even where this evidence is not extensive enough to establish discriminatory animus by itself." Estes, 856 F.2d at 1104. Although Megarry was no longer in White's direct chain of command during the actionable time frame, he was in her chain at the time the statement was allegedly made, and he remained thereafter in the same cubicle in the same department as Easthagen's peer. Throughout trial, Honeywell managers maintained that they did not know race was an issue until after White filed her first EEOC charge. If believed, the statement attributed to Megarry could be used to determine that the acts complained of during the actionable time period were more likely to have occurred than not. The statement, if believed, demonstrates that management may have failed to take action on White's frequent complaints out of a discriminatory animus, and it helps to define the general work atmosphere, or the totality of the circumstances, so it matters little that White did not hear Megarry's statement. The statement also could have been used to explain why Megarry took no action on the complaints White says she made directly to him. The statement is also relevant in resolving the ultimate question of constructive discharge -- whether the workplace was so racially abusive and hostile that a reasonable employee would have felt compelled to quit. See Delph, 130 F.3d at 356. "Evidence of a general work atmosphere [ ] - as well as evidence of specific hostility directed toward the plaintiff - is an important factor in evaluating the claim [of a hostile work environment]." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987).

In a case where race discrimination is the issue, the introduction of alleged racist remarks is not to be unexpected. The possibility that a jury might be so inflamed by

-10-

the contents of the remark so as to decide the case based on passion, needs to be balanced against the fact that such remarks are potent evidence of attitude and environment.  Having already heard the other racially pejorative appellations contained in the evidence, we doubt this additional statement would have been enough to have caused the jury to decide the case on an unfair basis.  The district court said it had a lot of confidence in the jury ("They are very sharp jurors.").  (Appellant's Adden. at 36.)  Here, because such evidence is so highly probative, the potential unfair prejudicial effect, i.e., its tendency to further inflame the jury is not enough to substantially outweigh its probative value.

The district court was also concerned that Megarry's unavailability rendered the statement unfairly prejudicial because Megarry was unable to explain or deny his statement.  We respectfully disagree.  This statement was admissible under Rule 801(d)(2)(D), and although it remains subject to the Rule 403 balancing of probative value and unfair prejudicial effect, unavailability itself is not a factor adding to unfair prejudicial effect.  The availability of the declarant is not relevant under Rule 801(d)(2)(D) because under the rule, the statement is not hearsay.  Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 538 (2d Cir. 1992).  Several courts have held that a statement by a declarant who is deceased at the time of trial may be admissible under Rule 801(d)(2)(D).  See Savarese v. Agriss, 883 F.2d 1194, 1201 (3d Cir. 1989) (citing Pino v. Protection Maritime Ins., 599 F.2d 10, 13 (1st Cir. 1979), and Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n, 551 F.2d 1136, 1138 (8th Cir. 1977)).  We agree with the Third Circuit's conclusion that in this circumstance, "the fact of the declarant's death impacts on the weight of the evidence rather than its admissibility."  Id.  Megarry's statement is admissible, regardless of his availability, as an admission by a party opponent, because the statement was made "by the party's [Honeywell's] agent or servant concerning a matter within the scope of the agency or employment [and was] made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).  Megarry's death and the inability to cross-examine him concerning the basis for the statement go to its weight, not to its admissibility.  While we understand the normal

-11-

human inclination is to look askance at those who attribute unkind or socially unacceptable statements to a deceased person who cannot defend himself, a plaintiff assumes the real tactical risk that a jury is very likely to discredit the purported utterance just because it is being offered.

While the statement, because of its potential high probative value (if believed), is undoubtedly damaging and therefore in that sense prejudicial to Honeywell's case, it is not unfairly prejudicial. It helps to define the essential background against which White's claim arose. We conclude that the district court's decision to preclude White from using this highly probative piece of evidence affected her substantial rights in this racial discrimination case and that its probative value clearly outweighs the danger of any unfair prejudicial effect the statement may carry with it. Thus, the district court abused its discretion by excluding Megarry's statement and committed reversible error.

B. The Agencies' No Probable Cause Findings

White's second evidentiary challenge attacks the district court's decision to admit the outcome of White's three administrative charges. The district court did not admit the documents themselves but allowed witnesses to testify to the ultimate findings of the agencies. "[W]e leave questions concerning the admission or exclusion of EEOC determinations to the sound discretion of the trial court." Estes, 856 F.2d at 1105. "The court must exercise its discretion, however, to ensure that unfair prejudice does not result from a conclusion based on a cursory EEOC review of the very facts examined in depth at trial." Id.; see also Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304, 1309 (8th Cir.), cert. denied, 469 U.S. 1041 (1984).

In this case, the district court held that the sequence of White's EEOC charges and their outcomes were relevant to the expert's diagnosis of White's condition, the sequence of events, and White's testimony of improper acts on behalf of the defendant. (See Appellant's Adden. at 14-15.) Honeywell first elicited the results of the EEOC

investigation from White's expert witness, Dr. Carol Novak, who testified on cross- examination that the EEOC's failure to find probable cause for White's charges of discrimination added additional stress and was a factor leading to White's breakdown. Honeywell also elicited the EEOC charge results from several Honeywell managers who testified -- Easthagen (White's supervisor), Caren Olsen (Easthagen's immediate supervisor), George Glasser (a labor relations manager), and Michael McEnnely (director of factory human resources). Honeywell's counsel mentioned the agency findings in opening and closing statements as well.

White complains that the district court abused its discretion by allowing Honeywell's repetitive references to the EEOC findings of no probable cause. We disagree. Our review of the record convinces us that the district court did not abuse its discretion by allowing witnesses to refer to the agency findings. White was allowed to present the rebuttal testimony of William Prock of the Minneapolis Department of Civil Rights. Prock testified about how the administrative investigation differs from the kind of fact-finding that occurs in a court of law, about the meaning of a no probable cause finding, and about the charging party's options after receiving a no probable cause determination. Furthermore, the district court instructed the jury that it "should not consider the findings of these other agencies to be binding upon you, but they may be considered by you as any other evidence." (Appellant's App. at  83.)  Further, the court's instruction told the jury, "You must make your own determination based upon your review of all the evidence presented to you." (Id.) When the court gives a limiting instruction, we assume that the jury followed that instruction. See United States v. Fregoso, 60 F.3d 1314, 1328 (8th Cir. 1995). Given White's opportunity to discredit the agency determinations and the district court's cautionary instruction warning the jury not to consider the agency findings as binding, we conclude that the district court did not abuse its discretion by admitting the results of the EEOC charges in this case.

## C.  Jury Instruction on Constructive Discharge

White contends that the district court erroneously instructed the jury on the elements of constructive discharge.  "A district court has broad discretion in drafting jury instructions."  Pittman v. Frazer, 129 F.3d 983, 987 (8th Cir. 1997).  On review, we simply determine "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury."  Kim v. Nash Finch Co., 123 F.3d 1046, 1057 (8th Cir. 1997) (internal quotations omitted).  "The form and language of jury instructions are committed to the sound discretion of the district court so long as the jury is correctly instructed on the substantive issues in the case."  Slathar v. Sather Trucking Corp., 78 F.3d 415, 418 (8th Cir. 1995) (internal quotations and alterations omitted), cert. denied, 117 S. Ct. 179 (1996).  We will reverse on the basis of instructional error only if we find that the error "affected the substantial rights of the parties."  Kim, 123 F.3d at 1057 (internal quotations omitted).

Instruction No. 20 addressed the claim of constructive discharge, requiring proof of three elements: (1) "the defendant intentionally made plaintiff's working conditions intolerable such that a reasonable person would feel forced to quit;" (2) "the plaintiff's race was a determining factor in the defendant's actions;" and (3) "the plaintiff quit her job, which was a reasonably foreseeable result of defendant's actions." (Appellant's Adden. at 52.)  White challenges the district court's use of the word "quit" in the instruction.  The uncontroverted evidence showed that White is on an unpaid medical leave of absence, but she is technically still employed by Honeywell.  To avoid use of the term "quit" in her given situation, White proposed an instruction which asked the jury to determine whether "her leaving the workplace was a reasonably foreseeable result of defendant's actions." (Appellant's Adden. at 50 (emphasis added).)  The district court rejected White's proposed instruction and also rejected her proposed modification of the court's instruction, in which she sought to substitute the words "leave" or "left" for "quit" in the court's instruction.

We have often stated that constructive discharge occurs when an employer "deliberately renders the employee's working conditions intolerable and thus forces [the employee] to quit his job." Johnson v. Bunny Bread Co., 646 F. 2d 1250, 1256 (8th Cir. 1981) (internal quotations omitted). In past cases, however, the question at issue generally has been whether the employer deliberately rendered the working conditions intolerable, not whether the employee actually "quit" the job. White claims that she should not be required to prove that she "quit" her job where she contends that intolerable working conditions forced her to take an unpaid medical leave of absence, required her to leave her job, and prevent her from returning.

We must determine whether a situation where allegedly intolerable working conditions force an employee into an unpaid medical leave of absence from which she is allegedly unable to return is essentially the same as forcing an employee to "quit" for purposes of proving a constructive discharge claim. We conclude that it is sufficient and that the district court committed reversible error by not adjusting the language from our cases to fit the facts and issues tried.

While we have not specifically addressed the question of whether forced unpaid medical leave is analogous to quitting, we have articulated the standard of constructive discharge in terms of "leaving" the employment. We have stated that constructive discharge occurs "when an employer intentionally renders working conditions so intolerable that an employee is essentially forced to leave the employment." Bradford v. Norfolk So. Corp., 54 F.3d 1412, 1420 (8th Cir. 1995). To be sure, this statement of the standard is not a complete answer to our question in this case, but our use of the word "leave" in prior cases instead of "quit" demonstrates that, in the past, we have not been overly concerned that a plaintiff prove she technically quit her job.

Lacking authority on point in our own circuit, we also consider the views of other courts. We are unable to find a circuit court opinion that considers the exact issue before us. In a slightly different context, the Second Circuit has stated, "A constructive

-15-

discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health." Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993). In a similar vein, the First Circuit has held that a constructive discharge may occur "when an employer effectively prevents an employee from performing his job." Sanchez v. Puerto Rico Oil Co., 38 F.3d 712, 719 (1st Cir. 1994).

Some district court cases have spoken directly to the issue at hand. In Llewellyn v. Celanese Corp., 693 F. Supp. 369, 381 (W.D.N.C. 1988), the court stated, "Even though [the plaintiff] did not quit, her medical leave without pay was caused by her intolerable work situation." The court held this to be a constructive discharge for the purpose of back pay liability. In a case from the Northern District of Texas, the court reasoned, "if 'granting leave' rises to the level of an adverse employment action, surely forcing [an employee] to take leave does as well." Shafer v. Dallas County Hosp. Dist., No. CA 3-96-CV-1580-R, 1997 WL 667933 at *6 (N.D. Tex. Oct. 21, 1997) (unpublished). The court concluded that constructive imposition of medical leave should be no less actionable under Title VII than constructive discharge; and for lack of a better term, the court called the forced medical leave situation a constructive discharge. Id. at *6 & n.11.

We are not prepared to say that "quit" is the magic word in a constructive discharge instruction. A person who has suffered a forced unpaid medical leave of absence, from which she is unable to return and which resulted from objectively intolerable working conditions, is in no better position than one who was forced to quit as a result of objectively intolerable conditions. In either case, the employer has, through objectively intolerable conditions, forced the employee out of active service. We believe it is sufficient for a plaintiff to prove that an employer deliberately rendered working conditions intolerable and thus forced the employee to permanently "leave" the employment; the employee need not prove that she technically "quit" in every case.

Given the facts at issue in this case, we conclude the district court's refusal to tailor the jury instructions to the facts of White's case affected White's substantial rights. The jury should have been told that it could find a constructive discharge if White proved that both her taking of the medical leave and her failure to return from it were caused by the alleged racially intolerable working conditions and were reasonably foreseeable. Requiring her to prove that she "quit" her job at Honeywell, when in fact she did not quit but contends that the abusive working conditions forced her to take an unpaid medical leave of absence from which she is unable to return, was tantamount to directing a verdict for Honeywell. Additionally, during deliberations, the jury submitted a written question to the district court indicating that the jurors were concerned over whether White had "quit" her job. The district court's answer merely directed them back to the language of Instruction No. 20. Thus, it is very likely that the inaccurate instruction affected the jury's deliberations and the jury verdicts. For these reasons, we conclude that the instructional error in this case is reversible error, and we remand for a new trial.

## III.

Accordingly, we conclude that the district court committed reversible error in failing to admit the alleged statement of Bill Megarry and in instructing the jury that White had to prove she "quit" her job. We reverse the judgment based on the jury verdicts and remand for a new trial in accordance with the views expressed in this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-17-