# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2975

_____

Retha Weems,

            Appellee,

v.

Tyson Foods, Inc.,

            Appellant.

\*   Appeal from the United States
\*   District Court for the
\*   Western District of Arkansas.

_____

Submitted: September 20, 2011
Filed: December 28, 2011

_____

Before RILEY, Chief Judge, COLLOTON and GRUENDER, Circuit Judges.

_____

RILEY, Chief Judge.

Retha Weems brought suit against Tyson Foods, Inc., claiming workplace gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-101, et seq. The jury returned a verdict in Weems' favor, and the district court entered judgment against Tyson for $708,994. We reverse and remand for a new trial, because improperly admitted compromise evidence materially prejudiced the jury's verdict.

## I.    BACKGROUND

### A.    Facts[1]

#### 1.    Early Employment

In 1988, Weems began working at the Hudson Foods poultry processing plant in Noel, Missouri (Noel plant or Noel).  Weems was employed as a Hudson superintendent at Noel when Tyson purchased the plant in 1998.  Weems continued to work at Noel for Tyson, and received a number of promotions.

In 2005, Rusty Bowsher, the complex manager at Tyson's poultry processing plant in Monett, Missouri, hired Weems to be the Monett plant manager.  At Monett, Weems reported directly to Bowsher, and he consistently gave her strong performance ratings.

While Weems was at the Monett plant, the Noel plant was plagued by production and quality control problems.  Tyson removed two successive plant managers between 2004 and 2006 because of the Noel plant's poor performance.  The United States Department of Agriculture (USDA) issued two Notices of Intended Enforcement (NOIE) against the Noel plant in 2004 and 2006 because the plant was not complying with federal food safety regulations.  These NOIEs indicated the government would suspend operations at the Noel plant if Tyson failed to correct the identified violations.

Tyson believed Weems was needed to address the problems at the Noel plant and offered her the position of plant manager.  Tyson vice presidents Bernie Adcock and Donnie King encouraged her to accept the position.  Because of the Noel plant's troubled history, Weems asked King and Adcock whether accepting the position would be a "career ending move."  They reassured her she would be given the time

---

[1]"We recite the relevant facts in the light most favorable to the jury's verdict." Quigley v. Winter, 598 F.3d 938, 944 n.2 (8th Cir. 2010).

and support she needed to turn the plant around. In spite of her misgivings, Weems eventually agreed to accept the position, provided Tyson would change the management structure at the Noel plant, give her two years to implement the necessary changes, and furnish her with a substantial salary increase. Tyson assented to these conditions, and gave Weems a raise of nearly $15,000, making her the highest paid poultry plant manager of her grade level at Tyson. Weems became the Noel plant manager on September 1, 2006.

### 2. Noel Plant Manager

Conditions at the Noel plant were atrocious when Weems took over. The equipment and facilities were in disrepair, resulting in wasted and contaminated product. The plant's other managers were encouraging inappropriate record-keeping to obscure the extent of employee absenteeism, contaminated and condemned poultry, and productivity problems. Weems immediately began addressing these issues.

Tyson continued to make personnel changes at Noel after Weems became plant manager. In February 2007, Tyson fired Patrick Johnston, the Noel complex manager and Weems' supervisor, and replaced him with Bowsher, Weems' former supervisor at Monett. In April 2007, Tyson created a new position at Noel—division operations manager—and appointed Tim Singleton, who had been a plant manager at a Tyson facility in Mexico. Around this same time, Adcock, who was then the division vice president responsible for the Noel plant and five other poultry processing facilities, was promoted. Chip Miller replaced Adcock as division vice president. Weems was the only female plant manager within Miller's division.

After Miller became division vice president, Weems fell out of favor with her supervisors. Tyson argued Weems' performance as plant manager did not meet its expectations. Tyson presented evidence of significant health and safety issues at the plant, the plant's continued poor performance and high operating costs, and the

perception of Weems' supervisors that she would be unable to implement the necessary changes to turn the plant around.

Weems claimed her firing was the result of gender discrimination. To refute Tyson's claim she was underperforming, Weems presented evidence showing she successfully accomplished her primary responsibility as plant manager by overcoming the NOIEs and bringing the plant nearer to regulatory compliance. Weems also contends many of the changes she made at the Noel plant were only beginning to produce results when she was removed.

To show disparate treatment based on her gender, Weems offered evidence she was treated differently than Singleton and similarly situated male managers at another facility. Weems presented evidence Miller harbored a discriminatory, sexist attitude toward her. Weems testified (1) Miller would ignore Weems and speak directly to Singleton when Miller toured the plant; (2) Miller harshly accused Weems of staring at him, remarking to her "What the hell are you looking at?"; and (3) she overheard Miller tell Bowsher, "women had no business being plant managers; they couldn't handle the heat."[2]

### 3.    Removal as Plant Manager

In October 2007, Bowsher, Miller, and Adcock discussed removing Weems from her position as plant manager. They "vett[ed]" the decision with a Tyson human resources director, and with Tyson's vice president of employment compliance.

On October 24, 2007, Weems heard a rumor from an outside contractor that she may be losing her job. She approached Bowsher about this news—which he confirmed. Bowsher advised Weems that Miller would meet with them the next day "to give [Weems her] options." Miller and Bowsher informed Weems she would be

---

[2]At trial, Miller and Bowsher denied this comment was made.

placed on a thirty-day administrative leave, during which Weems herself would be responsible for finding another position within the company. If she was unable to find a position, Tyson would terminate her employment.

In November 2007, Bowsher told Weems that Greg Nelson, Tyson's human resources division manager, would be her human resources contact during the transition. Weems was in frequent contact with Nelson as she searched for a new position. According to Weems' testimony, she told Nelson about Miller's comment to Bowsher and said she "felt like [she] was discriminated against because [she] was female." According to Weems, Nelson responded that Miller's comment did not reflect company policy and promised to look into it and get back to her.[3]

Nelson never followed up with Weems about her concerns. Nelson did, however, arrange to send Weems a "Separation Agreement and General Release" (separation agreement), which she received around November 28, 2007. Had Weems accepted the agreement, her employment would have terminated effective November 30, 2007, and Tyson would have paid her base salary and a portion of her medical benefits through January 4, 2008. Weems did not sign the agreement. In December, 2007, Weems accepted a position as general production manager at a Tyson facility in Springdale, Arkansas, where she remained employed through the trial.

## B.    Procedural History

Weems brought suit against Tyson for employment discrimination under the Civil Rights Act of 1964 and the Arkansas Civil Rights Act of 1993. At trial, Weems sought to prove (1) Miller arranged to have her removed from her position because of

---

[3]At trial, Nelson denied Weems told him about Miller's comment, and asserted he did not think there were any equal employment opportunity issues implicated by Weems' removal.

her gender, and (2) Nelson did not adequately investigate after Weems expressed her concern she had been the victim of gender discrimination.

To prove her allegations with respect to Nelson, Weems offered and testified about the separation agreement. Tyson objected, asserting the agreement was a compromise offer and therefore inadmissible under Fed. R. Evid. 408 (Rule 408). The district court held a sidebar conference to address Tyson's objection. The parties clarified that, when Weems received the agreement from Tyson, she was still on administrative leave seeking a new position with Tyson. The district court admitted the proffered testimony, reasoning Weems had not been told "[y]our 30 days are up and you're out," so the evidence was not "caught by [Rule] 408."

During closing argument, Weems' counsel emphasized the importance of the separation agreement for Weems' claims, stating

> The fifth reason [for finding in Weems' favor] is this separation agreement. [Weems] met with Greg Nelson, or talked with him on November the 6th, 2007. At that time, according to his notes, she told him that she felt that she had not been treated right. Of course, as HR manager, apparently those words didn't trigger anything in his thinking process. He was waiting for those magic word—or that magic word "discrimination." Yet, after that discussion he presents [Weems] with this separation agreement.

> Now, the important part here, the significant part, is that in exchange for receiving some money from Tyson, [Weems is] going to give up her right to sue the company for sex discrimination. Why would Mr. Nelson give this to [Weems], someone who had been removed from her job for poor performance, if she hadn't said something to him to the effect that she felt like she'd been discriminated against because she was a woman?

. . . .     Greg Nelson, the fellow from HR, I don't think it was his job to see that the [equal employment opportunity] policies were enforced. I'm thinking it's his job to make sure that the company didn't get sued, to protect the company. That's why that separation agreement was offered to [Weems].

During deliberations, the jury submitted a written question to the district court regarding the separation agreement. The jury inquired whether "all demoted/fired employees get a separation agreement and general release." The district court informed the jury it could not comment and directed the jury to rely on the evidence as presented by the parties.

The jury found for Weems, awarding her $108,994 for lost wages and benefits and $650,001 in compensatory and punitive damages. The district court reduced the latter sum to $600,000 to comply with statutory damage limitations.[4] Tyson moved for judgment as a matter of law or for a new trial, which were denied.

## II.  DISCUSSION

Tyson argues the district court abused its discretion under Rule 408 by admitting the separation agreement because the proposal was an offer to compromise Weems' gender discrimination claim and was admitted to prove Tyson's liability. We agree.

---

[4]Because of our disposition in this case, we need not consider Tyson's argument the district court improperly allocated the compensatory and punitive damages award between the state and federal causes of action, thereby maximizing Weems' recovery under the applicable damage limitations. See 42 U.S.C. § 1981a(b)(3)(D); Ark. Code Ann. § 16-123-107(c)(2)(A)(v).

## A. Standard of Review

"We review de novo the district court's interpretation and application of the rules of evidence, and review for an abuse of discretion the factual findings supporting its evidentiary ruling." United States v. Allen, 540 F.3d 821, 824 (8th Cir. 2008). We will reverse only if an evidentiary ruling constituted "a clear and prejudicial abuse of discretion . . . affect[ing] a substantial right of the objecting party." Vasquez v. Colores, 648 F.3d 648, 652 (8th Cir. 2011) (internal quotations omitted).

## B. Federal Rule of Evidence 408

At the time of trial, Rule 408(a) prohibited admission of evidence relating to a compromise or offers to compromise when such evidence was used "to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed. R. Evid. 408(a) (2006) (amended Dec. 1, 2011). This rule does not preclude the admission of all compromise evidence. Rule 408(b) explicitly permitted admission of such evidence if offered for another purpose. Permissible purposes under 408(b) "include[d] proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution."

Rule 408 promotes "the public policy favoring the compromise and settlement of disputes." Fed. R. Evid. 408 advisory committee's note (1972). As such, we consider the district court's application of this rule in light of its underlying purpose. Cf. Stockman v. Oakcrest Dental Ctr., 480 F.3d 791, 798-99 (6th Cir. 2007) (recognizing the admission of compromise evidence "going to the validity or amount of a claim . . . eviscerate[s] Rule 408's protection and undermine[s] its clear purpose"); Bradbury v. Phillips Petrol. Co., 815 F.2d 1356, 1364 (10th Cir. 1987) (explaining "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers").

We analyze this issue in three parts. First, we must address whether the separation agreement related to a claim that was in dispute as to validity or amount at the time the agreement was proffered. Second, assuming there was such a claim, we must assess whether Weems offered the separation agreement to prove Tyson's liability for or the validity of the claim, rather than for another acceptable purpose. And finally, upon determining the district court abused its discretion in admitting the separation agreement, we must address whether this was a material error for which Tyson is entitled to relief.

### 1. Disputed Claim

The separation agreement was clearly an offer of compromise within the meaning of Rule 408. See, e.g., Swan v. Interstate Brands Corp., 333 F.3d 863, 864 (8th Cir. 2003) (ruling an employee separation agreement was an offer of compromise and "inadmissible" under Rule 408). However, Rule 408 only prohibits admitting compromise evidence relating to a "claim" that was disputed when the settlement negotiations or offer to compromise took place. See Crues v. KFC Corp., 768 F.2d 230, 233 (8th Cir. 1985).

We have not substantially analyzed the "in dispute" requirement. See, e.g., id. (applying "in dispute" analysis with limited discussion). We agree with our sister circuits in recognizing a dispute need not "crystallize to the point of threatened litigation" for the 408 exclusion rule to apply. Affiliated Mfrs. v. Aluminum Co. of Am., 56 F.3d 521, 527 (3d Cir. 1995); accord Dallis v. Aetna Life Ins. Co., 768 F.2d 1303, 1307 (11th Cir. 1985). A dispute exists for Rule 408 purposes so long as there is "an actual dispute or difference of opinion" regarding a party's liability for or the amount of the claim. Affiliated Mfrs., 56 F.3d at 527; accord Dallis, 768 F.2d at 1307 (same).

On the facts of this case, Weems' claim clearly was "in dispute" when Tyson offered the separation agreement. The undisputed evidence shows, at the time Weems

contacted Nelson, Weems had been removed from her position as plant manager and placed on administrative leave. Weems knew she had only thirty days to find another position within the company to avoid termination. Weems claims she informed Nelson of her gender discrimination concerns, and Nelson's notes from that conversation confirm he understood Weems felt "she was not treated right" with respect to the circumstances of her removal.

While Nelson testified he did not recall Weems raising any concerns about gender discrimination, and Weems maintains she was not contemplating legal action at the time, neither contention undermines our conclusion the claim was in dispute at the time of the offer. Tyson sent the separation agreement to Weems after Tyson removed Weems from her position and inferentially in response to her expressed concerns over the circumstances of her removal. We have no difficulty concluding, as a matter of law, there was an actual dispute between Tyson and Weems when Tyson offered the separation agreement. See Cassino v. Reichhold Chem., Inc., 817 F.2d 1338, 1342 (9th Cir. 1987) (stating separation agreements offered to settle employment rights disputes arising after an adverse employment action are generally "inadmissible to prove liability pursuant to Rule 408").

To the extent the district court concluded the separation agreement was not "caught by [Rule] 408" because Weems was placed on temporary administrative leave rather than terminated, the district court's finding was an abuse of discretion. Weems was placed on a thirty-day administrative leave to allow her to locate another position within Tyson and, if unsuccessful, Tyson would terminate her. If Weems accepted the separation agreement,[5] she would release her claims and be terminated.

---

[5]The district court was correct, Tyson had not yet advised Weems "[y]our 30 days are up and you're out." However, the document presented to Weems was expressly labeled, and was in fact, a "SEPARATION AGREEMENT."

Not every employment separation agreement is an offer to settle a disputed claim under Rule 408. The district court has substantial discretion to determine whether, under the unique facts and circumstances of the case, a claim was in dispute at the time when a settlement offer was proffered. Based upon the facts of this case, Weems' claim against Tyson was in dispute when Tyson proffered the separation agreement.

### 2. Admissibility

We now address whether evidence relating to the separation agreement was admissible for a permissible purpose under Rule 408(b). Evidence relating to a compromise offer is admissible if "offered for 'another purpose,' *i.e.*, for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989). Weems argues she offered the separation agreement evidence to prove Tyson failed to "under[take] good faith efforts to comply with federal and state law." We reject Weems' argument because this purpose directly establishes Tyson's liability for the same claim the agreement was meant to settle.

In certain circumstances, evidence of a compromise offer may be admitted to show a party's lack of good faith. In Athey v. Farmers Ins. Exch., 234 F.3d 357, 361-62 (8th Cir. 2000), we upheld the trial court's admission of evidence from a settlement conference between an insurance company and the insured regarding a claim arising under an automobile insurance policy. The insurer refused to settle the claim unless the insured abandoned a pending claim of bad faith against the company. Id. at 361. Applying the substantive law of South Dakota, we held "an insurer's attempt to condition the settlement of a breach of contract claim on the release of a bad faith claim [could] be used as evidence of bad faith." Id. at 362. Weems has not alerted us to any authority indicating employment separation agreements are admissible under applicable substantive law, and we have found none. Athey, therefore, does not control this case.

-11-

The policy concerns underlying Rule 408 are strongly implicated where an offer of compromise is used to prove an element of the claim the compromise offer was meant to settle. See, e.g., Stockman, 480 F.3d at 797-98 (holding an employer's offer to settle a wrongful termination suit was inadmissible to rebut an allegation the plaintiff failed to mitigate damages); Trebor, 856 F.2d at 510 (explaining a party's letter offering to settle a contract dispute was inadmissible to prove compliance with the statute of frauds because "the two questions were so closely intertwined, admission of the documents . . . would . . . militate against the public policy considerations which favor settlement negotiations and which underlie Rule 408"). "It would be unreasonable to expect a party to ever make a settlement offer if doing so forced it into choosing between conceding one or more elements of liability or damages or having the offer admitted against it." Stockman, 480 F.3d at 798-99. Because Weems' issue of Tyson's bad faith is inseparable from the issue of liability, Rule 408(a) prohibits admission of the agreement in this case.

The settlement evidence was inadmissible to show Tyson's bad faith, and Weems has suggested no other purpose for which the evidence is relevant and admissible. In furthering the public policy of Rule 408, we conclude the district court committed a clear abuse of discretion by admitting this separation agreement evidence.

### C.    Materiality

Evidentiary errors are grounds for reversal only if the error affected a substantial right of the aggrieved party. See Nichols v. Am. Nat. Ins. Co., 154 F.3d 875, 889-90 (8th Cir. 1998). It is an "unusual case where a new trial is needed because a full and fair presentation of the claims was impeded at trial, and substantial prejudice resulted." Id. at 890. On the other hand, "[t]he parties have a right to untainted jury deliberations and a verdict which is based upon admissible evidence." Qualley v. Clo-Tex Int'l., Inc., 212 F.3d 1123, 1131 (8th Cir. 2000).

In this case, we are confronted with unusually clear and objective proof the improperly admitted evidence substantially influenced the jury's verdict. First, Weems' counsel emphasized the separation agreement in his closing remarks, arguing Tyson offered the agreement because Weems "felt like she'd been discriminated against because she was a woman," and the agreement proves Tyson was more concerned with protecting itself against liability than with ensuring Weems had been treated fairly. Weems' reliance on the evidence at closing suggests it materially influenced the jury verdict. See Nichols, 154 F.3d at 890 (explaining the party's "closing argument at trial demonstrate[d] that the [improperly admitted] evidence was intended to influence the jury's determination of liability," which indicates admission of the evidence was not harmless); Gulbranson v. Duluth, Missabe and Iron Range Ry., 921 F.2d 139, 142-43 (8th Cir. 1990) (similar).

During its deliberations, the jury submitted a written question to the district court, inquiring whether "all demoted/fired employees get a separation agreement and general release." This shows the jury was focused on the separation agreement during deliberations, and strongly supports the inference the jury materially relied on this evidence in reaching their verdict. See White v. Honeywell, 141 F.3d 1270, 1280 (8th Cir. 1998).

Weems argues the error was not material because the separation agreement was a "general release" and did not contain an admission of liability, and therefore had minimal probative value. See Haun v. Ideal Indus., 81 F.3d 541, 547-48 (5th Cir. 1996) (deciding the introduction of a similar employment separation agreement was harmless error because "the agreement did not influence the jury or had but a very slight effect on its verdict"). We reject Weems' argument. Unlike Haun, where there were no objective indications the jury relied on the separation agreement, Weems' closing arguments and the jury's question concerning the separation agreement cogently confirm the inference the error materially affected the jury's verdict.

-13-

Weems argues the error was harmless because there was ample evidence apart from the separation agreement supporting the jury's verdict. Assuming properly admitted evidence was sufficient to support the verdict, we must reverse if the improperly admitted evidence had "a substantial influence on the jury verdict," Nichols, 154 F.3d at 889. In this case it is "very likely that the [improperly admitted evidence] affected the jury's deliberations and the jury verdicts." White, 141 F.3d at 1280. Admission of the separation agreement deprived Tyson of a fair trial; thus, we reverse.

## III.    CONCLUSION

Under the facts of this case, we conclude the district court violated the policy and exclusionary provision of Rule 408 by admitting into evidence the separation agreement and related testimony, and it is likely this error materially influenced the jury's verdict. We vacate the judgment and remand this case to the district court for a new trial.

_____