**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1281**

JOHN H. MACSHERRY, JR.,

Plaintiff − Appellee,

v.

SPARROWS POINT, LLC; COMMERCIAL DEVELOPMENT COMPANY, INC.;
MICHAEL ROBERTS,

Defendants – Appellants.

**No. 19-1321**

JOHN H. MACSHERRY, JR.,

Plaintiff − Appellant,

v.

SPARROWS POINT, LLC; COMMERCIAL DEVELOPMENT COMPANY, INC.;
MICHAEL ROBERTS,

Defendants – Appellees.

Appeals from the United States District Court for the District of Maryland, at Baltimore.
Frederick P. Stamp, Jr., Senior District Judge.  (1:15-cv-00022-FPS)

Argued:  May 27, 2020                    Decided:  September 1, 2020

Before MOTZ and DIAZ, Circuit Judges, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

---

Vacated and remanded by published opinion. Judge Diaz wrote the opinion, in which Judge Motz and Judge Cogburn joined.

---

Joshua J. Gayfield, Megan J. McGinnis, MILES & STOCKBRIDGE P.C., Baltimore, Maryland, for Appellants/Cross-Appellees. Andrew K. O'Connell, THOMAS & LIBOWITZ, P.A., Baltimore, Maryland, for Appellee/Cross-Appellant.

---

DIAZ, Circuit Judge:

A jury awarded John Macsherry, Jr. $1 million on his claims against Sparrows Point, LLC; Commercial Development Company, Inc.; and Michael Roberts (collectively "the defendants") for nonpayment of a commission on the sale of a large parcel of industrial property located on the Sparrows Point peninsula, which juts out from Baltimore Harbor.[1] The defendants (who are based in St. Louis) employed Macsherry for approximately two years as their local, boots-on-the-ground representative in Baltimore while they performed environmental cleanup on the parcel, and upon its sale for $110 million, the jury found that they were contractually obligated to pay Macsherry 0.75% of that price.

On appeal, the defendants contend that the evidence is insufficient to support the jury's verdict as to all claims. Alternatively, they seek a new trial on two grounds, contending that the district court erred both in admitting evidence (under Fed. R. Evid. 408) of an alleged effort to compromise Macsherry's claim to a commission and in granting Macsherry a jury trial under Fed. Rs. Civ. P. 38(b) and 39(b).

As we explain, we agree that the evidence of the defendants' effort to compromise Macsherry's claim wasn't admissible for any purpose under Rule 408 and that the error wasn't harmless. That is, even assuming that the evidence is sufficient as a matter of law to support the jury's verdict, we cannot be confident that the jury was not substantially

---

[1] Macsherry's complaint alleges four claims: (1) Violations of the Maryland Wage Payment and Collection Law; (2) Breach of Contract, (3) Promissory Estoppel, and (4) Quantum Meruit.

swayed by the evidentiary error. Accordingly, the defendants are entitled to a new trial. But as we also find that the district court enjoyed ample discretion to grant Macsherry's untimely request for a jury trial under Rule 39(b), the new trial may remain before a jury.[2]

I.

We begin with the facts, many of which are contested, and the procedural history.

A.

1.

In the late 1980s, Michael Roberts bought his first piece of industrial real estate in the form of a defunct brewery. Within a year, he had demolished the facility, sold the scrap, remediated the property's environmental liabilities, and resold it for a huge profit. Looking to replicate the success of that venture, in 1990, Michael Roberts and his brother, Thomas,[3] founded Commercial Development Company, Inc. ("CDC"), a Missouri-based company, to facilitate the remediation and resale of other such 'brownfield' properties.

In the years since, the Roberts brothers have developed a business model whereby they form single-purpose companies to purchase individual brownfield properties, whose environmental liabilities are then remediated by CDC. The brothers then resell the parcels through their respective single-purpose companies. And while the brothers share control

---

[2] Because we remand for a new trial, we need not reach Macsherry's challenges on cross-appeal to the district court's amendment of the judgment.

[3] We occasionally refer to the brothers by their first names.

of all companies involved in the process, one of them is assigned principal responsibility for each property.

So it was that, in September 2012, the Roberts brothers formed Sparrows Point, LLC, another Missouri-based company, for the purpose of acquiring about 3,100 acres of highly contaminated industrial property on the Sparrows Point peninsula, where the Bethlehem Steel mill formerly stood. Michael Roberts was assigned responsibility for the Sparrows Point site, which was purchased in tandem with an unaffiliated, Chicago-based liquidation firm called Hilco Global. The transaction was structured so that Hilco acquired the site from the railroad tracks up, while Sparrows Point, LLC acquired it from the land down, including all of the environmental liabilities. As usual, the defendants planned to redevelop the land and then sell or lease their interest.

2.

Soon after the acquisition of the Sparrows Point site, CDC's then Vice President of Asset Management, Robert Schoelch, approached Michael Roberts to discuss, as Michael later testified, "hiring a local representative to act as boots on the ground in Baltimore." J.A. 782. In Schoelch's view, the defendants needed someone with a solid network in the community to help "move the project forward" by dealing with brokers, tenants, and state and local officials, among other responsibilities. J.A. 1421. According to Schoelch, they also discussed the need for a "commission component" to the position's compensation package, J.A. 1435, though Michael testified to the contrary and that he "never authorized" Schoelch to offer a commission component, J.A. 786.

5

Enter Macsherry, who, on September 20, 2012, sent an email to CDC's Chief Executive Officer, Randall Jostes, to inquire about working for "the owners of Sparrows Point." J.A. 440. As if reading Schoelch's mind, Macsherry billed himself as "a Baltimore person who ha[d] been in the real estate industry for close to 30 years," with "excellent experience" in "master planning" and "development," "excellent contacts in the community," and valuable "knowledge" of the Baltimore Harbor. J.A. 1611.

Macsherry's email was forwarded to Schoelch, who then called Macsherry. Over the ensuing weeks, the two men exchanged half a dozen more calls and emails regarding the boots-on-the-ground position—until, on December 4, 2012, Schoelch called Macsherry to say that the defendants wanted to make him an offer.

What happened next is somewhat disputed. Macsherry testified that Schoelch sent him an email (which, however, was never produced in discovery), along with a one-page term sheet attached (a copy of which *was* produced), that same day. *See* J.A. 1673 (the "Original Term Sheet"). Though it contains no date, names, or signature lines, the Original Term Sheet lists the relevant position as Sparrows Point, LLC's "Vice President of Leasing and Development" and recites, among other terms, a "Salary" of $50,000 per year and a "Commission" of "75 basis points paid on the total net value of any sales/leases or parcels." *Id.* Michael Roberts, Schoelch, and Macsherry all testified that they understood "75 basis points" to mean three-quarters of one percent, i.e., a 0.75% commission.

After receiving the Original Term Sheet, Macsherry sought to negotiate better terms, especially with respect to pay and vacation time. According to Macsherry, Schoelch said he would need to obtain Michael's approval for any changes, and shortly thereafter sent

6

Macsherry (in another email that was never produced in discovery) a red-lined version of the term sheet (a copy of which *was* produced in discovery). *See* J.A. 1657 (the "Red-Lined Term Sheet").

In addition to a newly listed start date of Monday, December 10, 2012, the Red-Lined Term Sheet recites a salary of $77,000 and two extra vacation days, while the commission term remains substantially the same at "75 basis points paid on the total value of any sales/leases or parcels on any deals closed after the Start Date." *Id.* Further, while the Red-Lined Term Sheet still lacks any date, names, or signature lines, the Tracked Changes panel of the Microsoft Word document that Macsherry received reflects that the changes were entered by "R. Schoelch" on December 4, 2012. *Id.*

After receiving the Red-Lined Term Sheet, Macsherry attempted again to negotiate better pay, but Schoelch told him that the revised deal was the best one that Michael Roberts "w[ould] agree to." J.A. 465. At that point, Macsherry said that he "[woul]d accept these terms and conditions." *Id.*

For his part, Schoelch recalled little about his interactions with Macsherry between September 20 and December 4, but conceded to having created and sent the Red-Lined Term Sheet to Macsherry. Not in dispute, however, was that no employment contract was formed on December 4 because the Red-Lined Term Sheet wasn't a formal offer, as Michael Roberts had not yet approved it.

On December 6, CDC flew Macsherry out to their headquarters in St. Louis. He spent about an hour meeting with the Roberts brothers, during which time they discussed such generalities as the redevelopment of the Sparrows Point site and the Baltimore real

7

estate scene, but not such details as Macsherry's compensation. "That kind of stuff," Michael Roberts would later testify, "was all . . . up to [Schoelch]." J.A. 785–86.

Macsherry then met with CDC's Chief Operating Officer and Director of Human Resources, Becky Lydon. According to Macsherry, after telling him that he was officially hired, Lydon gave him a "clean version" of the Red-Lined Term Sheet—that is, one without the redlines but with all the same terms—to sign. J.A. 469–70. Macsherry knew the clean version memorialized the same terms as the Red-Lined Term Sheet (including with respect to commission) because he had brought a copy of the latter along with him to St. Louis, and "compared the two documents" side-by-side right then and there. J.A. 470. Macsherry added that after he'd signed the clean version, Lydon said she would "get Mike Roberts to sign it" too and "send [him] a copy." J.A. 471. But Macsherry never received a copy, and no clean version of the Red-Lined Term Sheet—nor any other document purporting to be Macsherry's employment agreement—was ever produced in discovery.

Lydon's testimony paints an entirely different picture of this meeting. She never told Macsherry he was hired and, in fact, didn't even know that he'd been hired until later that day, when Schoelch told her so. Lydon had been asked to simply "go in and explain" what Macsherry's medical, dental, and vision benefits would be, J.A. 1328–29, and hadn't presented Macsherry with any employment agreement. And she didn't learn the details of Macsherry's compensation package until the next day, when Schoelch told her that Macsherry would be paid a salary of $77,000, with no commission component. As for Schoelch, he testified that he couldn't recall the final terms of Macsherry's compensation package.

8

3.

On December 10, 2012, Macsherry began working as CDC's Vice President of Development and Leasing—consistent with the date and position (though technically not the same employer) reflected in the Red-Lined Term Sheet.

Macsherry performed myriad duties as the defendants' local representative for the Sparrows Point site, such as dealing with officials from the Maryland Port Authority and other state and local agencies, supervising the extensive remediation of the site's complex environmental liabilities, managing the site's water and sewer infrastructures, dealing with the site's existing tenants, and creating a concept plan for marketing the redeveloped site. Macsherry also supervised a third-party real estate broker named Cassidy Turley, whom the defendants hired to find a buyer for the site (which Macsherry wasn't hired to do).

The leading candidate to purchase the redeveloped Sparrows Point site soon emerged as Hilco, the company that already owned the site from the railroad tracks up. Hilco had expressed its interest in acquiring the remainder of the site at a dinner with the Roberts brothers in late 2012. The brothers turned their end of the negotiations over to Schoelch and Jostes, who continued to court Hilco, with varying degrees of success, throughout 2013. For Macsherry's part, he testified that, while Hilco "wasn't [his] sale to make," J.A. 624, he was nonetheless involved in the client relationship by "doing what [he] was hired to do"—that is, by "dealing with Hilco on various issues" related to the defendants' redevelopment of the site, J.A. 621.

In May 2013, Macsherry negotiated the renewal of a lease with the Nelson Company, an existing tenant of the Sparrows Point site. Seeking payment of a 0.75%

9

commission (amounting to $281) on that renewal, Macsherry emailed Lydon and Schoelch separately, asking them each to send him a copy of his employment agreement, which he said he'd never received (to Lydon) or had misplaced (to Schoelch). Lydon responded that she was "in the middle of a big closing" and asked whether Macsherry had "checked with [Michael Roberts]." J.A. 1653. Macsherry replied that Michael "said he could not find it" and blamed its absence "on his filing system" (adding "like he has one"), but now attached a copy of the Red-Lined Term Sheet, which he characterized as an unsigned copy of his agreement. *Id.* Macsherry also sent Schoelch a copy of the Red-Lined Term Sheet, as well as a formal commission invoice.

The parties offer characteristically competing accounts of how Macsherry's request for a commission on the Nelson lease was resolved. According to Macsherry, Schoelch called to assure him that the Red-Lined Term Sheet reflected his employment terms and that he would receive the requested commission, but stated that it wasn't "a good time to process the invoice" because "there was a lot going on." J.A. 535. Schoelch, by contrast, testified that he told Macsherry that the Red-Lined Term Sheet "was not his term sheet," J.A. 1493, and that he didn't know the "final terms" of Macsherry's agreement, J.A. 1497. As for Lydon, she claimed that she reached out to Schoelch after receiving Macsherry's initial email and was told that Macsherry had no employment agreement, though she never relayed that information to him. By late July, Macsherry dropped his pursuit of a commission on the Nelson lease.

10

4.

After months of negotiations, Hilco agreed to buy the balance of the Sparrows Point site for $110 million. The deal closed on September 18, 2014, and the Roberts brothers pocketed upwards of $65 million in profit.[4]

As the Hilco sale was about to close, Macsherry emailed Lydon to request his 0.75% commission (amounting to $825,000) on the sale, attaching the Red-Lined Term Sheet in support. Lydon forwarded the request to Michael Roberts, who ignored it. Macsherry then called Michael directly and left him a voicemail about his request for a commission, and also sent him an email to the same effect, but Michael didn't respond to either.

On September 12, 2014, Lydon emailed Macsherry a formal termination letter effective upon the closing with Hilco. J.A. 1672. The letter stated that Macsherry would be paid "[a]ll payroll earned . . . as well as any vacation time earned but not yet taken" as of the date of the closing, but made no reference to any commission. *Id.* Macsherry responded to Lydon's email the next day, asserting that his employment agreement "had a commission clause of .75% of the sale value," that his compensation "was primarily based on the commission," and that he was "hopeful the company w[ould] honor this agreement." J.A. 1670. Lydon replied by asking whether Michael Roberts had called Macsherry to discuss his commission request "yet." *Id.*

---

[4] The defendants transferred funds from the Hilco sale to family trusts after MacSherry stated that he was planning to retain counsel over his unpaid commission.

On September 17, Macsherry told Lydon that he still hadn't heard from Michael about his request for a commission on the Hilco sale. The sale closed the following day, and Macsherry was terminated without a commission, though the defendants did pay a commission to Turley (the independent broker). On September 19, Macsherry emailed Michael Roberts again to request that he call him about his commission request, which Michael finally did.

During their first call, Michael asked Macsherry to send him a copy of the document supporting his request for a commission, and Macsherry obliged by sending him the Red-Lined Term Sheet. The substance of their second call is hotly disputed. According to Macsherry, Michael told him: "I know I owe you a commission. I don't believe you deserve a commission as big. What will you take?" J.A. 591–92 (the "Compromise Statements"). In response, Macsherry said that he believed he was owed the full 0.75% commission reflected in the Red-Lined Term Sheet, but remained open to an offer. Michael said he would think about it and get back to him, but never did.

In Michael's telling, however, he told Macsherry that the Red-Lined Term Sheet was "not an employment agreement" and that Macsherry wasn't owed any commission.[5] J.A. 938. Michael also told Macsherry that he wasn't "opposed" to paying Macsherry "a bonus of some sort," but didn't actually make an offer. *Id.* Whatever was said, Macsherry and Michael reached no resolution that day or thereafter.

---

[5] At trial, however, Michael admitted that he never asked Schoelch whether he offered Macsherry a commission.

Macsherry filed suit in the Circuit Court for Baltimore County in November 2014, asserting four alternative claims: (I) violation of Maryland's Wage Payment and Collection Law (the "MWPCL"), *see* Md. Code Ann., Lab. & Empl. § 3-501 *et seq.*, which creates a cause of action to recover wages left unpaid upon termination, *id.* § 3-507.2(a); (II) breach of contract; (III) promissory estoppel; and (IV) quantum meruit. Macsherry also asserted a fifth claim for what the district court called "enhanced damages" under the MWPCL, J.A. 420, which allows for recovery of up to treble damages where the wages were withheld "not as a result of a bona fide dispute," Md. Code Ann., Lab. & Empl. § 3-507.2(b).

Macsherry's state-court complaint didn't expressly demand a jury trial. Rather, it referenced a jury only in the ad damnum paragraphs at the end of each of Macsherry's four substantive claims, which requested the court to "[a]ward . . . any other relief this Court or a jury deems appropriate." J.A. 37, 38, 39, 41. The complaint was also accompanied by a Case Information Report pursuant to Md. R. 2-111, in which Macsherry checked the "No" box of the "Jury Demand" section. J.A. 47.

The defendants removed the case to the district court for the District of Maryland, invoking the court's diversity jurisdiction. On the Civil Cover Sheet accompanying the notice of removal, the defendants likewise checked the "No" box of the "Jury Demand" section, which said to "Check Yes only if demanded in complaint." J.A. 29.

The defendants simultaneously moved to dismiss the complaint, which the district court granted in part, as to Michael Roberts alone, on the ground that the complaint failed to state a claim against him individually. *Macsherry v. Sparrows Point, LLC*, No. 1:15-cv-

22 (D. Md. May 21, 2015). Attempting to cure this pleading defect, Macsherry filed an amended complaint—which, like his initial, state-court complaint, only referenced a jury in the four ad damnum paragraphs' requests for "any other relief this Court or a jury deems appropriate." J.A. 59, 60, 62, 63. Michael Roberts again moved to dismiss the amended complaint on individual liability grounds, which the district court granted in part, as to claims II, III, and IV. *Macsherry v. Sparrows Point, LLC*, No. 1:15-cv-22, 2015 WL 6460261, at *9–15 (D. Md. Oct. 23, 2015).

In January 2016, the parties filed a joint status report in which Macsherry first contended that the case was "to be tried by a jury." J.A. 98. The defendants countered "that a proper jury demand was not made," however, and the parties noted that "[m]otions practice may be required to resolve the dispute." *Id.* To that end, Macsherry moved again to amend his complaint (as well as to reopen discovery), seeking to add an express demand for a jury trial. But the district court denied the motion, finding amendment improper under Fed. R. Civ. P. 15 and, in any event, insufficient to cure any failure to properly demand a jury trial under Fed. R. Civ. P. 38(b). *Macsherry v. Sparrows Point, LLC*, No. 1:15-cv-22, 2016 WL 8669914, at *8, 11 (D. Md. Oct. 28, 2016).

The parties then briefed cross-motions for summary judgment, which the district court denied. *Macsherry v. Sparrows Point, LLC*, No. 1:15-cv-22, 2017 WL 3315262 (D. Md. Aug. 3, 2017) (the "Summary Judgment Opinion"). The court found that the case was "riddled with significant factual disputes," *id.* at *36, including whether the parties agreed to the commission term reflected in the Red-Lined Term Sheet and, if so, whether that term was ambiguous in its scope, *see id.* at *21–24.

14

C.

With the case set for trial, Macsherry moved for a jury trial alternatively under Fed. Rs. Civ. P. 38(b) and 39(b), which the district court granted on both grounds. *Macsherry v. Sparrows Point, LLC*, No. 1:15-cv-22, 2017 WL 5591798, at \*8 (D. Md. Nov. 17, 2017) (the "Jury Trial Opinion"). The court found that the references to "this Court or a jury" in the ad damnum paragraphs of the complaint sufficed to demand a jury trial under Rule 38(b), and even assuming they didn't, Macsherry was entitled to a jury trial under Rule 39(b) pursuant to the "balancing test" of *Malbon v. Pennsylvania Millers Mutual Insurance Co.*, 636 F.2d 936 (4th Cir. 1980). *Id.* at \*2–8.

Prior to trial, the parties also briefed two motions in limine, including one by the defendants to exclude evidence of Michael Roberts's Compromise Statements pursuant to Fed. R. Evid. 408. The district court preliminarily denied both motions, subject to the presentation of the evidence at trial. *Macsherry v. Sparrows Point, LLC*, No. 1:15-cv-022, 2018 WL 1123696, at \*5 (D. Md. Mar. 1, 2018) (the "Motions in Limine Opinion"). With respect to the Compromise Statements, the court found that they were admissible without limitation because they didn't fall under the exclusionary provision of Rule 408(a), and even assuming they did, they were admissible under Rule 408(b) for the limited purpose of proving Macsherry's entitlement to enhanced damages under the MWPCL. *Id.* at \*3–5.

The parties proceeded to a seven-day jury trial. At trial, the defendants renewed their Rule 408 objection to the evidence of the Compromise Statements, but the district court overruled the objection and admitted the statements without limitation. The defendants then moved for a directed verdict under Fed. R. Civ. P. 50(a) at the close of

15

Macsherry's evidence, which the district court denied as well. The jury returned a verdict in favor of Macsherry on all claims. It also awarded Macsherry $1 million in net damages, consisting of $825,000 in compensatory damages[6] (the full value of his claimed commission on the Hilco sale) plus $175,000 in enhanced damages.

The defendants subsequently moved pursuant to Fed. R. Civ. P. 50(b) for judgment notwithstanding the verdict or, alternatively, for a new trial on the ground that Macsherry presented insufficient evidence to support the jury's verdict. The district court denied the motion. *Macsherry v. Sparrows Point, LLC*, No. 1:15-cv-22, 2019 WL 557005, at *5 (D. Md. Feb. 12, 2019). But the court granted the defendants' alternative motion to amend the judgment pursuant to Fed. R. Civ. P. 59(e), for reasons not relevant here.

This appeal followed.

II.

The defendants first contend that the district court erred in admitting evidence of the Compromise Statements under Fed. R. Evid. 408. We review the court's admission of the evidence for abuse of discretion and its underlying legal conclusions de novo. *See United States v. Benson*, 957 F.3d 218, 228 (4th Cir. 2020). In so doing, we find that the admission

---

[6] Specifically, the jury awarded Macsherry $825,000 in compensatory damages on each of his two contract claims (i.e., substantive violation of the MWPCL and breach of contract); $825,000 on his quantum meruit claim; and $175,000 on his promissory estoppel claim. But because the jury found that the parties had an express contract, the district court eliminated Macsherry's awards under the two quasi-contract claims. And because the two contract claims arose from a single harm, the court entered judgment awarding Macsherry compensatory damages under just one of them (the MWPCL claim).

16

was legal error because the statements constituted an effort to compromise an actual dispute over Macsherry's claim to a commission on the Hilco sale, and weren't admissible for any purpose separable from proving or disproving the validity of that claim. We direct appropriate relief as more fully explained below.

A.

We start with the text of Rule 408, which this court has had few occasions to consider. The Rule consists of two provisions. *First*, subsection (a) provides that evidence of "the following" types of statements "is not admissible" on behalf of any party "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction":

> (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408(a). *Second*, however, subsection (b) provides that such evidence may be admitted "for *another* purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b) (emphasis added).

Thus, our task here is to determine whether the Compromise Statements are the sort of evidence implicated under Rule 408(a); and if so, whether they were admissible under

17

Rule 408(b) for a purpose other than to prove (or disprove) the validity or amount of Macsherry's claim to a commission. We take these steps in turn.

1.

At bottom, Rule 408(a)'s exclusionary provision extends to evidence of an effort to "compromise" a "disputed claim." *See* Fed. R. Evid. 408(a). As an initial matter, we join a majority of our sister circuits in recognizing that a dispute "need not 'crystallize to the point of threatened litigation'" to implicate this provision. *See Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 965 (8th Cir. 2011) (quoting *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 527 (3d Cir. 1995)); *see also Dallis v. Aetna Life Ins. Co.*, 768 F.2d 1303, 1307 (11th Cir. 1985); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 390 (4th Cir. 2015) (Wynn, J., concurring). *But see Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1373 (10th Cir. 1977) (suggesting the opposite view).

Rather, in our view, a dispute exists for purposes of Rule 408(a) "so long as there is 'an actual dispute or difference of opinion' regarding a party's liability for or the amount of the claim" at issue. *Weems*, 665 F.3d at 965 (quoting *Affiliated Mfrs.*, 56 F.3d at 527); *accord Dallis*, 768 F.2d at 1307; *Drakeford*, 792 F.3d at 390. This broader view not only best interprets Rule 408(a)'s plain language, but also best promotes the "public policy favoring the compromise and settlement of disputes" underlying this exclusionary rule. *See* Fed. R. Evid. 408 advisory committee's note to 1972 proposed rules; *cf. Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 655 (4th Cir. 1988) (noting Rule 408's "strong public policy"). After all, the value of promoting efforts to settle disputes that have entered the doors of a court applies all the more to disputes that haven't yet done so.

18

The district court agreed with this principle, but found that there was nonetheless no actual dispute or difference of opinion regarding Macsherry's claim to a commission on the Hilco sale at the time Michael Roberts allegedly made the Compromise Statements. *See Motions in Limine Opinion*, 2018 WL 1123696, at *5. In so holding, the court reasoned that Michael's previous efforts "to *avoid*" Macsherry's requests for a commission on the Hilco sale "fl[ew] in the face of any notion of a dispute." *Id.* In other words, the court effectively ruled that a dispute must be *explicitly* communicated from one party to the other before it implicates Rule 408(a).

We think that it strains both the plain language of Rule 408(a) and the record to conclude that a dispute over Macsherry's claim to a commission on the Hilco sale didn't exist at the time of the alleged Compromise Statements. *See Weems*, 665 F.3d at 966. *Weems* is instructive on this point. There, our sister circuit held that a separation agreement "was clearly an offer of compromise within the meaning of Rule 408" where the defendant employer had sent it shortly after the plaintiff employee had complained that her being placed on administrative leave amounted to gender discrimination. *Id.* at 964–66. The court reasoned that even though the defendant "never followed up" with the plaintiff about her complaint of discrimination, *id.* at 963, their offer to pay her an additional month of salary in exchange for a release of all claims (and the end of her employment) implied an actual difference of opinion, *id.* at 965–66.

So too here, the defendants had clearly—if impliedly—communicated a difference of opinion over Macsherry's claim to a commission on the Hilco sale by the time of the Compromise Statements. Recall that, even crediting Macsherry's account of the events

19

surrounding his earlier request for a commission on the Nelson lease, the defendants had been ignoring his invoice for a mere $281 for well over a year by then, and showed no intention of changing their tune. The defendants also had never so much as sent Macsherry, as he put it, "any kind of acknowledgement" about the status or whereabouts of his final agreement, let alone a copy of it. J.A. 555. As a result, Macsherry sent Lydon another copy of the Red-Lined Term Sheet on September 9, 2014, when he first requested a commission on the Hilco sale, being "concerned" that the defendants weren't on the same page about the terms of his agreement. J.A. 554.

The dispute over the commission became more pronounced over the ensuing weeks. Notably, while Macsherry received no "follow up" from Lydon or Michael Roberts for several days after his initial requests, *see Weems*, 665 F.3d at 963, the termination letter that he received from Lydon on September 12 came "inferentially in response" thereto, *see id.* at 665–66, insofar as it addressed Macsherry's outstanding payroll entitlements without mentioning any commission. Indeed, Macsherry was so alarmed at the omission that he responded by urging the defendants to "honor" their "agreement" to pay him a commission. J.A. 1670.

But rather than honor the alleged agreement, the defendants instead terminated Macsherry without paying him any commission. Michael Roberts then persisted in ignoring Macsherry's requests to discuss his commission after terminating him. Surely, the only "reasonable inference" to be drawn from such extensive efforts to avoid Macsherry's requests and terminate him without a commission is that the defendants disputed their obligation to pay the commission in the first instance.

20

Moreover, even if Michael Roberts's difference of opinion wasn't sufficiently clear when he finally gave Macsherry a call on September 25, the Compromise Statements themselves lay it bare. In Macsherry's own telling, Michael's alleged statements explicitly disputed at least the amount of his claim to a commission on the Hilco sale, *see* J.A. 591–92 ("I don't believe you deserve a commission as big."), and explicitly sought to negotiate a compromise, *see* J.A. 592 ("What will you take?"). And in response, Macsherry says that he invited Michael to make him an "offer." *Id.* Such evidence thus plainly consists of "statement[s] made during compromise negotiations" about Macsherry's disputed claim. *See* Fed. R. Evid. 408(a)(2).[7] In finding otherwise, the district court erred.

2.

We turn next to consider whether the Compromise Statements were properly admitted for a purpose other than "to prove or disprove the validity or amount" of Macsherry's disputed claim to a commission, Fed. R. Evid. 408(a). We don't think the district court admitted it for any such purpose.

To the contrary, because the district court found that the Compromise Statements were admissible without limitation, the court allowed them to be used for one of the very purposes foreclosed thereunder: to prove the *validity* of the claim that "the compromise offer was meant to settle." *See Weems*, 665 F.3d at 966–67. The evidence was indeed

---

[7] Indeed, even in Michael's telling of the phone call, he explicitly contested the validity of Macsherry's claim to a commission and expressed a willingness to pay him "a bonus of some sort," J.A. 938, further indicating that—whatever was actually said—the conversation consisted of an attempt to compromise a dispute over Macsherry's claim.

highly relevant to show the validity of Macsherry's claim to a commission on the Hilco sale, since Michael Roberts's alleged statements conceded as much. And by the same token, the validity of Macsherry's claim to such a commission was *the* central issue at trial with respect to each of his substantive claims.[8] Thus, because the district court's premise that the evidence didn't implicate Rule 408(a) was faulty, it follows that the court erred in allowing the evidence to be admitted for such a purpose.

We also think the district court erred in finding (in the alternative) that, even if the evidence was inadmissible to prove the validity of Macsherry's substantive claims, it was admissible under Rule 408(b) to prove Macsherry's claim for enhanced damages under the MWPCL. Here, the court reasoned that the evidence showed that the defendants withheld Macsherry's commission "not as a result of a bona fide dispute," which would entitle him to recover up to three times the value of the commission. *See* Md. Code Ann., Lab. & Empl. § 3-507.2(b). A "bona fide" dispute means simply a "good faith" or "legitimate dispute over the validity of the claim or the amount that is owing." *Admiral Mortg., Inc. v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000). In other words, the district court supposed that proving the defendants' *bad-faith* liability for Macsherry's commission was a purpose distinct from proving their *mere* liability for it.

---

[8] Whereas Macsherry's claims for substantive violation of the MWPCL, breach of contract, and quantum meruit all turned on the existence of an express or implied contract promising to pay Macsherry a commission on the Hilco sale, his claim for promissory estoppel turned on the existence of a non-contractual promise to the same effect.

22

While the purpose identified by the district court is technically distinct from that of proving the validity of Macsherry's claim, the court failed to consider whether that purpose is "inseparable" from one foreclosed under Rule 408(a). *See Weems*, 665 F.3d at 967. *Weems* is again instructive on this point. There, our sister circuit held that the separation agreement discussed above wasn't admissible to prove the defendant's "lack of good faith" because such a purpose "directly establishe[d]" the defendant's liability for the plaintiff's claim. *Id.* at 966. The court reasoned that, because the issue of the defendant's "bad faith" was inseparable from that of the claim's validity, it didn't constitute "another purpose" within the meaning of Rule 408(b). *See id.* at 967. After all, the other purposes mentioned thereunder, "such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution," Fed. R. Evid. 408(b), are far removed from the purposes barred under Rule 408(a).

Other circuits have likewise construed Rule 408(b) to exclude purposes inseparable from proving or disproving the validity or amount of the disputed claim. *See, e.g.*, *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 798 (6th Cir. 2007) (holding that evidence of a compromise offer wasn't admissible under Rule 408(b) to show a failure to mitigate damages because such a purpose "goes to the amount of the claim" (cleaned up)); *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (same where the evidence was offered to show compliance with the statute of frauds because such a purpose is "closely intertwined" with proving the validity of the claim); *cf. Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir. 1987) ("[W]hen the issue is doubtful, the better practice is to exclude evidence of . . . compromise offers."). As these

23

courts have aptly stated, "[c]are should be taken that an indiscriminate and mechanistic application of [Rule 408(b)'s] exception," *Trebor Sportswear*, 865 F.2d at 510 (cleaned up), doesn't "eviscerate Rule 408[a]'s protection and undermine its clear purpose," *Stockman*, 480 F.3d at 798.

The same result follows here. Simply put, because the defendants' bad-faith liability for Macsherry's claim to a commission under Md. Code Ann., Lab. & Empl. § 3-507.2(b) is inseparable from the underlying validity of that same claim, the district court erred in admitting the Compromise Statements to prove Macsherry's entitlement to enhanced damages.

B.

Of course, the district court's error in admitting the Compromise Statements does not necessarily compel relief. Instead, we must assess whether the error was harmless within the meaning of Fed. R. Civ. P. 61. To deem an evidentiary error harmless, we must be able to say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Smith v. Baltimore City Police Dep't*, 840 F.3d 193, 201 (4th Cir. 2016) (cleaned up), *as amended* (Nov. 1, 2016). And here, we cannot say that.

Evidence of the Compromise Statements was particularly harmful to the defendants with respect to Macsherry's claim for enhanced damages. True, other evidence in the record supported the claim, such as the defendants' persistent efforts to avoid Macsherry rather than deny his claim outright; Roberts's admission that he didn't ask Schoelch whether he offered Macsherry a commission; and the defendants' transfer of funds from

24

their corporate accounts to family trusts after learning that Macsherry intended to retain counsel. But it's difficult to imagine any more probative evidence on the question of the defendants' good faith than an admission by CDC's owner that Macsherry was entitled to a commission on the Hilco sale. In fact, the Compromise Statements were the *only* evidence of bad faith that the district court cited in denying the defendants' motion for summary judgment on this claim. *See Motion for Summary Judgment Opinion*, 2017 WL 3315262, at *33. It follows that such evidence wasn't harmless with respect to the jury's verdict awarding enhanced damages.

While Macsherry's remaining claims present a closer call, we are insufficiently certain that the jury's verdicts with respect to them weren't likewise substantially swayed by the error. True, the jury reasonably could have credited Macsherry's theories of liability all the same without evidence of the Compromise Statements. For instance, it was largely undisputed that Schoelch drafted the Red-Lined Term Sheet during preliminary negotiations about Macsherry's agreement, and Macsherry testified that he signed a clean version of that term sheet upon being formally offered the job. And the jury could have still found that the commission term reflected in the Red-Lined Term Sheet applied whether or not Macsherry was responsible for procuring the buyer.

But we can't say with a *fair* assurance that the jury would have found that Macsherry was entitled to an $825,000 commission on the Hilco sale if the Compromise Statements had been excluded. Notably, those statements were the sole evidence tending to undermine all three of the defendants' principal theories of non-liability, namely: (1) that Macsherry had no formal employment agreement; (2) that even if he did, Michael Roberts was

25

required to (yet didn't) sign off on any commission term; and (3) that even if *he* did, the commission term should be construed (in accordance with trade usage) to depend on Macsherry's procurement of the buyer.[9]

The probative value of the evidence wasn't lost on Macsherry, who emphasized Michael Roberts's alleged admission that he was owed a commission on the Hilco sale at length, and for each of these purposes, in closing argument. And especially since the statements were made by an individual who, in Macsherry's own words, "exercised an unusual level of control" over his companies and their employees, J.A. 1090, we think the likelihood that they made a powerful impression on the jury is too substantial to overlook. Thus, even if the jury generally credited Macsherry's version of events, we can't say with sufficient certainty that evidence of the Compromise Statements wasn't the straw that broke the camel's back. *Cf. Weems*, 665 F.3d at 968 (finding harmful error where the improperly admitted evidence "very likely . . . affected the jury's deliberations and . . . verdicts," even if the properly admitted evidence "was sufficient to support the verdict" (cleaned up)).

---

[9] Defendants contend separately that they're entitled to judgment as a matter of law on Macsherry's MWPCL wage claim because the alleged commission isn't a compensable "wage" under the statute. They are wrong. The commission fits comfortably within the statute's definition of a wage, which includes "all compensation that is due to an employee for employment." Md. Code Ann., Lab. & Empl. § 3-501(c)(1). *See also Medex v. McCabe*, 811 A.2d 297, 302 (Md. 2002) ("Commissions are clearly within the scope of the Act . . . ."). Macsherry testified that the commission was intended to be a part of his overall compensation package. That is enough to dispose of defendants' contention that the commission was unenforceable because it was gratuitous.

In sum, the district court's errors under Rule 408 entitle the defendants to a new trial.

## III.

### A.

Having granted the defendants a new trial, we next consider whether that trial may take place before a jury by taking up their contention that the district court erred in granting Macsherry's motion for jury trial pursuant to both Fed. Rs. Civ. P. 38(b) and 39(b). We review the court's grant of a jury trial for abuse of discretion, *Pac. Fisheries Corp. v. HIH Cas. & Gen. Ins., Ltd.*, 239 F.3d 1000, 1002 (9th Cir. 2001), and its underlying legal conclusions de novo, *Brown & Pipkins, LLC v. Serv. Employees Int'l Union*, 846 F.3d 716, 730 (4th Cir. 2017). And we conclude that, while the court erred in finding that Macsherry properly demanded a jury trial under Rule 38(b), it didn't exceed the scope of its broad discretion to grant him a jury trial nonetheless under Rule 39(b).

### B.

The Federal Rules of Civil Procedure preserve "inviolate" the parties' "right of trial by jury as declared by the Seventh Amendment to the Constitution," Fed. R. Civ. P. 38(a), providing two ways to invoke it. *First* and foremost, a district court "must" designate an action "as a jury action" whenever a jury trial "has been demanded under Rule 38." Fed. R. Civ. P. 39(a). *Second*, even if a jury hasn't been "properly demanded," under Rule 38(b), a district court "may, on a motion, order a jury trial on any issue for which a jury might have been demanded." Fed. R. Civ. P. 39(b). We address these avenues in turn.

27

1.

Rule 38(b) provides that "[o]n any issue triable of right by a jury, a party may demand a jury trial by: (1) serving the other parties with a written demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issue is served; and (2) filing the demand in accordance with Rule 5(d)." Fed. R. Civ. P. 38(b). This rule applies to actions (like this one) arising under removal jurisdiction through Rule 81(c)(3), which provides that a party "entitled to a jury trial under Rule 38 must be given one" if the party either "expressly demanded a jury trial in accordance with state law" prior to removal or "serves a demand" in accordance with Rule 38(b) within fourteen days after service of the last pleading directed to the issue (or, if "all necessary pleadings have been served at the time of removal," within fourteen days after service of the notice of removal). *See* Fed. R. Civ. P. 81(c)(3)(A)–(B). But a party who fails to properly demand a jury trial under Rule 38(b) or state law "waives a jury trial," at least as a matter of *right*. *See* Fed. R. Civ. P. 38(d), 81(c)(3)(A).

Macsherry failed to properly demand a jury trial under these interlocking rules. For starters, the parties don't dispute the district court's ruling that Macsherry's state-court complaint failed to expressly demand a jury trial in accordance with Maryland law. *See Jury Trial Opinion*, 2017 WL 5591798, at *3; *cf.* Md. R. 2-325. Macsherry was therefore required to a file a demand in accordance with Rule 38(b) within fourteen days of being served with the defendants' last pleading (since all necessary pleadings hadn't been served at the time of removal). But while filed within that time, Macsherry's amended complaint likewise failed to properly demand a jury trial.

28

In finding to the contrary, the district court mistakenly relied on our observation (in an unpublished decision) that "technical" compliance with Rule 38(b) "is not necessarily required" to demand a jury trial. *See Hohman v. Dunning*, 991 F.2d 789 (table), 1993 WL 127955, at *2 (4th Cir. 1993) (per curiam) (finding Rule 38(b) satisfied where pro se plaintiff's jury demands failed to "include a certificate of service as required by a local court rule"); *see also Gargiulo v. Delsole*, 769 F.2d 77, 78–79 (2d Cir. 1985) (finding Rule 38(b) satisfied where defendants' jury demand was "made on the last page of their answer," and thus "not in the preferred style"). Yet even non-technical compliance requires that a party *actually* demand a jury trial. Macsherry simply didn't do that.

The district court's reliance on *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061 (9th Cir. 2005), was also misplaced. In that case, our sister circuit began by noting that, "[i]deally," a demand under Rule 38(b) should be made "in a separate document or set off from the main body of the pleading in order to make [it] readily recognizable." *Id.* at 1064 (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2318 (2d ed. 1994)). But heeding its obligation to "indulge every reasonable presumption against waiver" of the "fundamental" right to a civil jury trial, *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393 (1937), the court held that the ad damnum paragraphs of the plaintiff's complaint—which requested damages "in such amount as may be *awarded by a jury*,"—sufficed to invoke the right because they were "sufficiently clear to alert a careful reader that a jury trial [was] requested," 403 F.3d at 1064–65 (cleaned up).

Even assuming that *Lutz* marks the outer limit of Rule 38(b), this case falls beyond it. Recall that the ad damnum paragraphs of Macsherry's amended complaint referred to

29

relief awarded *not only* by "a jury," *but also* by "this Court," joined by the disjunctive "or." J.A. 59, 60, 62, 63. Unlike Lutz's, Macsherry's ad damnum paragraphs thus referenced *both* possible factfinders alternatively, suggesting no election between them either way. Moreover, the ad damnum paragraphs of Macsherry's state-court complaint had used the same equivocal language even as the attached Case Information Report expressly declined a jury trial. On these facts, even a careful reader wouldn't have understood Macsherry's complaint to request a jury trial. This case therefore presents no reasonable presumption against waiver.

2.

Even though Macsherry "waive[d] a jury trial" as of right by failing to file a proper demand under Rule 38, *see* Fed. R. Civ. P. 38(d), the district court retained discretion to "order a jury trial" on motion by Macsherry under Rule 39, *see* Fed. R. Civ. P. 39(b). We think the district court acted within its discretion in granting that motion.

We have not squarely addressed the scope of a district court's discretion to grant a motion for jury trial under Rule 39(b). Though the district court here exercised its discretion by looking to the factors we enumerated in *Malbon*, that enumeration was dictum in light of our sole holding that any Rule 39(b) argument had been waived, *see* 636 F.2d at 940–41. Nor have we ever applied the factors to a Rule 39(b) motion.[10]

---

[10] The *Malbon* factors "include (1) whether the issues are more appropriate for determination by a jury or a judge . . . ; (2) any prejudice that granting a jury trial would cause the opposing party . . . ; (3) the timing of the motion . . . ; [and] (4) any effect a jury trial would have on the court's docket and the orderly administration of justice." 636 F.2d at 940 n.11 (cleaned up).

Our sister circuits have tended to construe a district court's discretion to grant relief under Rule 39(b) rather narrowly, albeit in "diametrically . . . opposite" respects. 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2334 (3d ed. 2020). Some circuits hold that a district court should exercise its discretion to grant a jury trial "in the absence of strong and compelling reasons to the contrary." *Swofford v. B & W Inc.*, 336 F.2d 406, 409 (5th Cir. 1964), *cert. denied*, 379 U.S. 962 (1965); *accord Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1013 (6th Cir. 1987); *Parrott v. Wilson*, 707 F.2d 1262, 1267 (11th Cir. 1983); *AMF Tuboscope, Inc. v. Cunningham*, 352 F.2d 150, 155 (10th Cir. 1965).

By contrast, a roughly equal number of circuits take the position that a district court may only exercise its discretion to grant an untimely demand for a jury trial under Rule 39(b) upon a showing of "good reason for the belated demand." *Olympia Exp., Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 352 (7th Cir. 2007); *accord Pac. Fisheries Corp.*, 239 F.3d at 1002 ("An untimely request for a jury trial must be denied unless some cause beyond mere inadvertence is shown."); *Noonan v. Cunard S. S. Co.*, 375 F.2d 69, 70 (2d Cir. 1967) (same); *see also SEC v. Infinity Grp. Co.*, 212 F.3d 180, 195 (3d Cir. 2000) ("Courts in this Circuit generally deny relief when the only basis for such relief . . . is the inadvertence or oversight of counsel.") (cleaned up)).

We find more persuasive the view of the First Circuit, however, that the scope of discretion granted under Rule 39(b) "is very broad," such that "the case would be very rare indeed where a district court abused its discretion in denying *or* granting a Rule 39(b) motion." *Rowlett v. Anheuser-Busch, Inc.*, 832 F.2d 194, 200 (1st Cir. 1987), *abrogated*

31

*on other grounds by Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999). Indeed, this view alone reads Rule 39(b) according to its plain and ordinary language, which places no qualification on a district court's discretion to grant an untimely demanded jury trial. *See* Fed. R. Civ. P. 39(b) ("[T]he court may, on motion, order a jury trial . . . ."). And by the same token, it alone recognizes the soundness of the rule's granting district courts—which generally exercise "broad discretion" over "core matters of trial management," *United States v. Lefsih*, 867 F.3d 459, 467 (4th Cir. 2017)—the same authority to decide the very format of the trial in cases where the right to a civil jury has been waived.

The view that district courts enjoy broad discretion to grant or deny a motion under Rule 39(b) also comports with our decision in *Gen. Tire & Rubber Co. v. Watkins*, 331 F.2d 192 (4th Cir. 1964), *cert. denied*, 377 U.S. 952 (1964), which dealt with the flip side of the coin. That case held that a district court didn't abuse its discretion where it *denied* a motion under Rule 39(b) based on the court's view that "the technicalities involved in determining the issues of patent validity and infringement" raised there, though triable by a jury, were better suited to a bench trial. *Id.* at 197–98.

Allowing that some cases *may* present "exceptional circumstances" that "would appear to compel the court, in the exercise of its discretion, to order a jury trial," we found that the circumstances at issue were a far cry from the sort. *Id.*; *see also McCray v. Burrell*, 516 F.2d 357, 371 (4th Cir. 1975) ("[W]e cannot say that there were such exceptional circumstances that the failure to grant the . . . motion was an abuse of discretion." (citing *Gen. Tire & Rubber*, 331 F.2d at 197–98)). Our decision today simply extends the same

principles to a district court's correlative discretion to *grant* a motion under Rule 39(b), which likewise warrants deference in the absence of exceptional circumstances.

The defendants assert that such a deferential view of Rule 39(b) "emasculates" the waiver provision of Rule 38(d). *See Gen. Tire & Rubber*, 331 F.2d at 198. Not so.

Whereas the view that Rule 39(b) *compels* district courts to grant relief would present such a concern, *see id.*, our view that the rule affords district courts broad *discretion* to grant relief takes the opposite approach. In so doing, it respects the balance struck by these interlocking rules, whereby a party must be afforded a jury trial if one is properly demanded, but takes his chances with the court's discretion if not. And because a court may just as easily employ that discretion to deny an untimely request, a party who desires a jury trial remains incentivized to properly demand one.

In this case, we are satisfied that the district court didn't exceed its broad discretion to grant Macsherry's motion for a jury trial under Rule 39(b). In so doing, the court emphasized that Macsherry had given notice of his desire for a jury well in advance of trial, that a jury trial wouldn't disrupt the court's docket, and, most importantly, that a jury trial wouldn't prejudice the defendants. *See Jury Trial Opinion*, 2017 WL 5591798, at \*7–8. Such reasoning—in which the defendants identify no defect—is adequate to support a favorable exercise of discretion. And so, while (absent exceptional circumstances) the court would have also been within its discretion to deny Macsherry's belated request for a jury trial, we discern no abuse in its decision to grant the motion.

33

\* \* \*

For the reasons given, we vacate the district court's judgment and remand the case for a new trial.

*VACATED AND REMANDED*