**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-2228

RICHARD S. MARTIGNETTI,

      Plaintiff – Appellant,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

      Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge.  (1:18-cv-02431-RDB)

Submitted:  January 29, 2021                Decided:  March 31, 2021

Before AGEE, THACKER and QUATTLEBAUM, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

James Edward Rubin, RUBIN EMPLOYMENT LAW FIRM, P.C., Rockville, Maryland, for Appellant.  Justin R. Barnes, Atlanta, Georgia, Donald E. English, Jr., JACKSON LEWIS P.C., Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Richard S. Martignetti sued his former employer, International Business Machines Corporation ("IBM"), for unpaid commissions. Specifically, Martignetti alleged that IBM unlawfully and retroactively "capped" his sales commissions despite previous representations that they would be "uncapped." Martignetti brought claims for violating the Maryland Wage Payment and Collection Law ("MWPCL"), fraud, negligent misrepresentation, and unjust enrichment. The district court dismissed the operative complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, we affirm in part, vacate in part, and remand for further proceedings.

I.

We accept as true Martignetti's allegations for purposes of this appeal. *See Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 388 (4th Cir. 2014); *cf. Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). Through that lens, the relevant facts are as follows.

Martignetti worked as a salesman and manager for IBM from 2005 to 2018. While there, his compensation consisted of both a base salary and incentive compensation, the latter of which included commissions and bonuses. Martignetti earned incentive compensation in accordance with IBM's written plans. His claims here stem from a plan that was in effect from January 1, 2017 to June 30, 2017, the terms of which were conveyed through a PowerPoint document titled "Your 2017 Incentive Plan" (the "Plan") and an Incentive Plan Letter ("IPL").

2

The Plan highlighted important information about sales representatives' compensation, specifically addressing Martignetti's classification as a salesman of "Software as a Service" or "SaaS" products. According to the Plan, each representative was assigned a sales quota and a corresponding "target incentive" (or commission). In Martignetti's classification, representatives received 1% of their target incentive for every 1% of sales earned up to 100% of the quota. If they sold more than their quota, they would receive an increased percentage of their target incentive: 3% for all sales between 100% and 200% of their quota and 2% for all sales exceeding 200% of their quota. The Plan repeatedly indicated that commissions were "uncapped." J.A. 73; *see also, e.g.*, J.A. 77 ("Earnings opportunity is uncapped.").

The IPL provided further details explaining IBM's incentive compensation plan for the relevant period. Relevant here, it included an "Earnings Clause," which provided that incentive payments

> are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period. . . . Incentive payments will be considered earned only if you have met all payment requirements, including: (1) you have complied with the Incentive Plan; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; and (3) the customer has paid the billing for the sales or services transaction related to your incentive achievement.

J.A. 85.

The IPL also incorporated various disclaimers. For example, it stated that "[t]he Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it." J.A. 84. IBM also "reserve[d] the right to adjust the Plan terms,

3

including, but not limited to . . . applicable incentive payment rates or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals[.]" J.A. 84. The IPL contained two additional disclaimers allowing IBM the right to adjust incentive payments, first for any calculation errors related to incentive payments, and second for any specific transaction where the incentive payment would be "disproportionate."[1] J.A. 85. And if a conflict ever arose between any of the IPL's disclaimers and local law, it made clear that local law "will prevail." J.A. 84.

IBM cut Martignetti's base salary by 18% in recognition of the potential payout he could receive as commissions. For the relevant time period, his sales quota was $5,019,158 and his corresponding target incentive was $77,878. During the covered period, Martignetti and his team identified hundreds of sales opportunities and pursued them. Ultimately, the team completed approximately sixty-two different sales for a total of $34,759,088, or 692.53% of Martignetti's quota. Based on the commission calculation set out in the Plan, that amount of sales should have resulted in $928,543 in commissions.

In the months after the covered period, IBM reviewed Martignetti's sales and confirmed that all of them were approved as commissionable. In addition, all sales had been paid for, and there was no suggestion that Martignetti had engaged in any action that

---

[1] The second disclaimer stated in full:
If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.
J.A. 85.

4

would cause any part of the commission not to be paid. Martignetti's team received their full commissions, but he did not.

Although IBM paid portions of what Martignetti had earned, it unilaterally and retroactively capped his commissions at 300% of his quota. At no time did IBM dispute the amount of the sales or provide a firm or written explanation for its decision. In total, Martignetti alleges he was denied $526,000 in earned commissions.

Martignetti eventually learned that he was not alone. Apparently, IBM had a consistent practice of promising uncapped commissions as an incentive to employees and then unilaterally and retroactively imposing caps. Indeed, discovery from various lawsuits brought under similar circumstances confirmed the existence of IBM's practice and revealed that IBM's own witnesses believed that practice violated the Plan's plain language.

Martignetti brought suit alleging a violation of the MWPCL for withholding earned wages, fraud, negligent misrepresentation, and unjust enrichment. He sought $1,578,000 in actual, compensatory, and statutory damages, as well as punitive damages. IBM moved to dismiss for failure to state a claim under Rule 12(b)(6). Pointing to language in the IPL authorizing IBM to exercise sole discretion to change the terms of the incentive payments, IBM asserted its final decision to adjust Martignetti's commission was authorized and disclosed. Thus, it could not serve as a basis for any of his claims.

The district court agreed with IBM's interpretation and concluded the plain language of the Plan and IPL precluded Martignetti's claims as a matter of law. The court

granted IBM's motion and dismissed the operative complaint with prejudice. Martignetti noted a timely appeal. This Court has jurisdiction under 28 U.S.C. § 1291.

## II.

### A.

We review de novo a district court's decision to grant a motion to dismiss. *Owens*, 767 F.3d at 388. "At this stage in the proceedings, [the Court must] accept as true all of the factual allegations contained in the complaint, and draw all reasonable inferences in favor of the plaintiff," here, Martignetti. *Id.* (internal quotation marks and citation omitted). But "such deference is not accorded legal conclusions stated therein." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).

To survive a motion to dismiss, Martignetti had to "state a claim to relief that [was] plausible on its face," meaning that he had to "plead[] factual content that allow[ed] the court to draw the reasonable inference that [IBM was] liable." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.

We turn first to the district court's dismissal of Martignetti's MWPCL claim. The MWPCL "is a statutory cause of action, the purpose of which is to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages." *Cunningham v. Feinberg*, 107 A.3d 1194, 1202 (Md. 2015). It requires that "[e]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the

6

wages if the employment had not been terminated." Md. Code Ann., Lab. & Emp. § 3-505(a). The MWPCL defines "wage" as "all compensation that is due to an employee for employment," which can include "a commission." *Id.* § 3-501(c)(1)–(2); *Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 226 n.9 (4th Cir. 2020); *see also Medex v. McCabe*, 811 A.2d 297, 302 (Md. 2002) ("Commissions are clearly within the scope of the [MWPCL]."). For a commission to count as a "wage," however, "the employee must have been *promised* the particular form of compensation as remuneration for his labor." *Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 418 (4th Cir. 2005); *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671–72 (Md. 2001) ("[T]he wages which an employee is due, and which must be paid . . . , consist of all compensation, and any other remuneration, that the employee was promised in exchange for his work. In other words, . . . to be wages, to be included within the statute, the payment must have been promised to the employee as compensation for work performed." (internal quotation marks omitted)); *cf. Medex*, 811 A.2d at 302 ("We have held that it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage. Where the payments are dependent on conditions other than the employee's efforts, they lie outside the definition.").

Martignetti argues that the district court erred in dismissing his claim because a jury could reasonably find that IBM had promised to pay his earned commissions, rendering them "wages" under the MWPCL. Specifically, he maintains that, even though the IPL allowed modification of the incentive plan, it did not allow modification *after* the commission was earned. But even if it did, because the IPL also said that its disclaimers

7

give way to contrary local law, he contends that the MWPCL precluded IBM from reducing the amount of commissions after they had been earned.

We are not persuaded. The plain language of the Plan and IPL precludes counting the specific commission amounts he seeks as "wages" under the MWPCL. Put simply, IBM did not make a binding promise to pay Martignetti a particular rate of commission in exchange for his work. To be sure, the Plan set out the formula IBM intended to use. But the IPL repeatedly and unreservedly stated that IBM could adjust the amount of any commission at its sole discretion. Because IBM never promised Martignetti that he would be paid a particular commission rate, unpaid amounts under the Plan's formula cannot be considered "wages" under the MWPCL.

While at first blush the IPL's Earnings Clause may seem to conflict with these disclaimers, it ultimately does not support Martignetti's claim. The Earnings Clause sets benchmarks for when "[i]ncentive payments" change from "a form of advance payment based on incomplete business results" to being "earned under the Plan terms." J.A. 85. But it in no way purports to take priority over the disclaimer language—that is, that the Plan is not a promise to pay in the first instance and that IBM reserves sole discretion as to what amounts are distributed to employees as earned commissions.

Other disclaimers in the IPL support this conclusion because they reiterated IBM's ability to adjust the amounts distributed as commissions. And they did so in ways that demonstrate that IBM's unfettered discretion to adjust the amount of a commission continues even after the criteria in the earnings provision is satisfied. For example, the IPL made clear that progress reports were "provided for informational purposes only, and do[]

8

not constitute a promise by IBM to make any specific distributions to [an employee]." J.A. 85. And the IPL stated that IBM reserved "the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments" resulting from any number of errors, including errors in creating sales objectives. J.A. 85. Lastly, the IPL reserved IBM's "right to review and, in its sole discretion, adjust the incentive achievement and/or related payments" of specific customer transactions that either had a disproportionate effect when compared with anticipated opportunities when setting the objectives or was disproportionate in comparison to an employee's contribution to the transaction. J.A. 85. When viewed in the context of the IPL as a whole, these disclaimers, along with those previously mentioned, lead to the unremarkable conclusion that IBM never promised payments at a specific commission rate. *Cf. Jensen v. Int'l Bus. Machs. Corp.*, 454 F.3d 382, 388 (4th Cir. 2006) (observing under similar circumstances that,"[a]t most, IBM announced a policy of payment in which it reserved discretion to itself to make the payment and to determine its amount[.]").

As a result, we affirm the district court's dismissal of Martignetti's MWPCL claim.

C.

Finally, we consider Martignetti's common law claims for fraud, negligent misrepresentation, and unjust enrichment. After briefing concluded in this case, a panel of this Court determined that materially indistinguishable claims on nearly identical facts were sufficient to survive dismissal under Rule 12(b)(6). *See Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146 (4th Cir. 2020). Because we are bound by that decision, we vacate the

9

district court's dismissal of Martignetti's common law claims for the reasons stated in *Fessler* and remand for further proceedings.

III.

Accordingly, we affirm the dismissal of Martignetti's MWPCL claim, vacate the district court's dismissal of his common law claims, and remand for further proceedings. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this Court and argument would not aid in the decisional process.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*